NO. 07-00-0530-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



APRIL 16, 2002



______________________________




THE STATE OF TEXAS FOR THE BEST INTEREST


AND PROTECTION OF K.D.C., AS A MENTALLY ILL PERSON


_________________________________



FROM THE COUNTY COURT OF LUBBOCK COUNTY;



NO. 2000-789,652; HONORABLE TOM HEAD, JUDGE



_______________________________



Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

 Appellant K.D.C. appeals from orders committing her for temporary inpatient mental
health services and authorizing administration of psychoactive medication. We reverse
and render as to both orders.

BACKGROUND

 On November 1, 2000, K.D.C. was detained in Levelland, Hockley County, and
taken to the Sunrise Canyon Hospital (the hospital) in Lubbock. An Order for Protective
Custody was issued by the Lubbock County judge (the "trial judge" or "trial court") pursuant
to an Application for Emergency Detention and Temporary Mental Health Services. The
application alleged that K.D.C. was mentally ill and evidenced a substantial risk of harm
to herself or others in that she was exhibiting manic behavior and hyper-religiosity, and
was unable to care for herself. The order for protective custody was to expire on
November 6, 2000. Pursuant to agreement of K.D.C.'s attorney ad litem, the order was
extended until November 9, 2000. 

 On November 9, 2000, the trial court held a hearing to determine whether K.D.C.
should be detained for court-ordered temporary inpatient mental health services for up to
90 days. See Tex. Health & Safety Code Ann. § 574.034(a) (Vernon Supp. 2002). (1) The
trial court granted the State's motion. The court's order included findings that K.D.C. was
mentally ill and that each of the subdivisions of HSC § 574.034(a)(2) were applicable. The
court adjudged appellant mentally ill, determined that she required inpatient care and
treatment in a mental health facility and ordered that she be committed for inpatient mental
health services for a period not exceeding 90 days. See HSC § 574.034(g). After finding
that K.D.C. required inpatient care and treatment and ordering that she be committed for
such treatment, the court held a hearing on and granted the State's application to
administer psychoactive medications to K.D.C. 

 K.D.C. does not challenge the determination that she was mentally ill. See HSC §
574.034(a)(1). However, she challenges the evidentiary support for findings required
pursuant to HSC § 574.034(a)(2). She also challenges the order authorizing
administration of psychoactive medications. 

 K.D.C. asserts five issues, but groups the first four together for argument. By her
first issue, K.D.C. argues that the evidence was insufficient to prove that she would likely
cause harm to herself or others. See HSC § 574.034(a)(2)(A) and (B). Her second issue
alleges that the evidence was insufficient to prove that she was suffering severe distress,
see HSC § 574.034(a)(2)(C)(i), or deterioration of her ability to function independently. 
See HSC § 574.034(a)(2)(C)(ii). In her third issue, K.D.C. asserts that the evidence was
insufficient to prove that she was not capable of surviving safely in freedom. By her fourth
issue, K.D.C. generally contends that the evidence was insufficient to prove that the
requirements of HSC § 574.034 were met as to her. Her fifth issue urges that the order
authorizing administration of psychoactive medications is invalid because it must be based
on a valid order that she be committed for inpatient care, and the order for inpatient care
was not valid for the reasons urged in her first four issues. See HSC § 574.104(a)(3),
(b)(3). Although K.D.C. does not clearly set out whether she is challenging the legal or
factual sufficiency of the evidence, we construe the issues to be both legal and factual
sufficiency challenges. See Tex. R. App. P. 38.1(e). 

STANDARD OF REVIEW

 In instances requiring the trial court to exercise its function as a factfinder and to
also make legal determinations and to exercise its discretion in making a decision based
on combination of the two functions, appellate review is multi-faceted. See Bocquet v.
Herring, 972 S.W.2d 19, 21 (Tex. 1998). Necessary underlying factual findings by the trial
court are reviewable for legal and factual sufficiency of the evidence. Id. Decisions vested
in the discretion of the trial court based on predicate factual findings supported by the
evidence, decisions involving application of legal principles, or decisions involving
application of or matters of law are reviewed only to determine whether the trial court acted
without reference to any guiding rules and principles. See Craddock v. Sunshine Bus
Lines, Inc., 134 Tex. 388, 393, 133 S.W.2d 124, 126 (1939). 

 An appellate court reviewing "no evidence" or legal sufficiency complaints may
consider only the evidence and inferences that tend to support the finding and must
disregard all contrary evidence and inferences. See Continental Coffee Prods. Co. v.
Cazarez, 937 S.W.2d 444, 450 (Tex. 1996). In the absence of direct evidence, a finding
may be upheld on circumstantial evidence if the finding may be fairly and reasonably
inferred from the facts. See Blount v. Bordens, Inc., 910 S.W.2d 931, 933 (Tex. 1995). 

 If a finding is challenged for factual sufficiency of the evidence, all of the evidence
is reviewed. See Lofton v. Texas Brine Corp., 720 S.W.2d 804, 805 (Tex. 1986). The
review includes evidence both favorable to and contrary to the findings. See In re King's
Estate, 150 Tex. 662, 664-65, 244 S.W.2d 660, 661 (1951). We reverse on the basis of
factual insufficiency only if the verdict is so against the great weight and preponderance
of the evidence that it is manifestly erroneous or unjust. Id. Where enough evidence is
before the factfinder that reasonable minds could differ on the meaning of the evidence or
the inferences and conclusions to be drawn from the evidence, we may not substitute our
judgment for that of the factfinder. See Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex.
1988). 


LAW 

 A judge may order a proposed patient to receive court-ordered, temporary inpatient
mental health services only if the judge finds, from clear and convincing evidence, that:

 (1) the proposed patient is mentally ill; and

 (2) as a result of that mental illness the proposed patient:

 (A) is likely to cause serious harm to himself;

 (B) is likely to cause serious harm to others; or

 (C) is:

 (i) suffering severe and abnormal mental,
emotional, or physical distress;

 (ii) experiencing substantial mental or physical
deterioration of the proposed patient's ability to
function independently, which is exhibited by the
proposed patient's inability, except for reasons
of indigence, to provide for the proposed
patient's basic needs, including food, clothing,
health, or safety; and

 (iii) unable to make a rational and informed
decision as to whether or not to submit to
treatment.

HSC § 574.034(a).


 Clear and convincing evidence is that measure or degree of evidence that will
produce in the mind of the trier of fact a firm belief or conviction about the truth of the
allegations sought to be established. In re Breeden, 4 S.W.3d 782, 784 (Tex.App.--San
Antonio 1999, no pet.). In order to meet the clear and convincing standard required by
HSC § 574.034(a), the evidence must include expert testimony and, unless waived,
evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:


 (1) the likelihood of serious harm to the proposed patient or others; or

 (2) the proposed patient's distress and the deterioration of the proposed
patient's ability to function.


HSC § 574.034(d). 


 An expert opinion recommending involuntary commitment must be supported by a
showing of the factual basis on which it is grounded. See In re Breeden, 4 S.W.3d at 784;
Goldwait v. State, 961 S.W.2d 432, 434 (Tex.App.--Houston [1st Dist.] 1997, no writ). A
threat of harm to the patient or others must be substantial and based on actual dangerous
behavior manifested by some overt act or threats in the recent past. See Taylor v. State,
671 S.W.2d 535, 538 (Tex.App.--Houston [1st Dist.] 1983, no writ). Evidence that an
individual is mentally ill and in need of hospitalization is not evidence that the statutory
standard for involuntary commitment has been met. See Broussard v. State, 827 S.W.2d
619, 622 (Tex.App.--Corpus Christi 1992, no writ); State for Interest of P.W., 801 S.W.2d
1, 3 (Tex.App.--Fort Worth 1990, writ denied). Psychotic behavior alone is insufficient to
justify commitment on grounds of mental distress and deterioration of the ability to function
independently. See Broussard, 827 S.W.2d at 622; T.G. v. State, 7 S.W.3d 248, 252
(Tex.App.--Dallas 1999, no pet.). Moreover, such behavior is not evidence of a "continuing
pattern of behavior that tends to confirm the likelihood of serious harm to [the proposed
patient] or others." Id. 



ANALYSIS

 As we have previously noted, K.D.C. does not challenge the trial court's finding that
she was mentally ill. She challenges, in effect, the proof and findings of a recent overt act
or a continuing pattern of behavior on her part as required by HSC § 574.034(d). 

 The State presented testimony from three witnesses: Margaret Lair, director of
social services at Sunrise Canyon Hospital; Harold Veits, M.D., a psychiatrist; and K.D.C. 
K.D.C. called her husband, W.T.C., as a witness. 

 Lair was assigned as K.D.C.'s social worker in the hospital and had worked with
K.D.C. every day that K.D.C. had been in the hospital, except for one Saturday. Lair
testified to the history given by K.D.C. According to that history, at the time K.D.C. was
detained in Levelland, she and W.T.C. were on their way to Whiteface, Texas. K.D.C. had
lived at Girlstown in Whiteface and had attended high school there. She wanted to try to
find out about her past, and her husband was going to try to find a job there. Additionally,
K.D.C. was going to try to find Post Office Box 179, which was a drug and alcohol
treatment center, to try to find out what God wanted her to do. K.D.C. and W.T.C. had
walked from Midland to Levelland on their way to Whiteface. K.D.C. related that she had
been diagnosed with bipolar disorder and that she had been hospitalized in Victoria,
Texas, for about three days in October, 2000. 

 According to Lair, K.D.C. was exhibiting rapid, pressured speech and religious
ideations when first admitted to the hospital. For example, according to Lair, K.D.C.
believed she was experiencing a "miraculous birth" because K.D.C. reported a recent
positive pregnancy test despite having had a previous hysterectomy. Lair testified that the
hospital also administered a pregnancy test to K.D.C. and that it was positive. Lair termed
the hospital's test result as a "false" positive, however, because the hospital later
performed a blood test on K.D.C., and the results indicated that K.D.C. was not pregnant. 
Lair further testified that despite the results from the blood test, K.D.C. refused medication
at first because she continued to believe that she was pregnant. (2) According to Lair, K.D.C.
agreed to accept Haldol after she was convinced that it would be the least dangerous
medication for her if indeed she were pregnant. K.D.C. also agreed to take Depacote, a
mood stabilizing medication. 

 Lair's opinion was that K.D.C. had shown remarkable improvement ("about 80
percent") during her hospitalization. When asked by the State's attorney if, despite her
improvements, K.D.C. "is still suffering a deterioration of her ability to function" Lair
responded that K.D.C. had made remarkable improvement and recognized her need for
medication, but that the hospital personnel questioned K.D.C.'s support system outside the
hospital, and that Lair had "concern" that "we" do not know K.D.C. well enough to know
whether she would continue to take her medications and that if she did not, she would
become psychotic again. Lair was also "concerned" about K.D.C.'s mood level and that
her medication dosage might need to be changed. 

 On cross-examination, Lair reported that the hospital had no history of K.D.C. failing
or refusing to take medication when it was prescribed for her. She also reiterated her prior
testimony that K.D.C. told Lair and Dr. Veits that she knew she needed to be on
medication. Lair opined that appellant was not a danger to others.

 Dr. Harold Veits attended and examined appellant during her hospitalization. Dr.
Veits testified as an expert in support of the application, and his qualifications are not in
dispute. Dr. Veits evaluated appellant and diagnosed her as suffering from bipolar
disorder, manic phase, which is considered a mental illness. He concurred in Lair's
opinion that appellant was not likely to cause serious harm to others. Nevertheless, he
opined that (1) K.D.C. posed a threat of serious harm to herself in the sense that she
would be unable to function in the community due to her lack of organization and inability
to conduct her daily affairs; (2) appellant was suffering severe and abnormal mental,
emotional or physical distress because she was being held in a hospital, and not being
allowed to pursue her interests and concerns; (3) as a result of appellant's mental illness,
she was experiencing substantial mental or physical deterioration of her ability to function
as exhibited by appellant's inability to provide for her own needs, although he had seen
no indication that appellant was malnourished or starving, and that at least since she had
been in the hospital she had been taking care of her hygiene in a normal manner; (4) as
a result of her mental illness, appellant was unable to make a rational and informed
decision as to whether or not she should submit to treatment; (5) a continuing pattern of
behavior tended to confirm appellant's distress and deterioration of her ability to function,
in that appellant had been recently hospitalized in Victoria, although he clarified on cross-examination that K.D.C.'s condition had begun improving over "the last day or two"; (6) he
did not believe that appellant could successfully be treated on an outpatient basis. Dr.
Veits assumed that much of the recent improvement in appellant was due to the Haldol she
agreed to take, and since the hospital had only recently changed appellant's medication,
he believed that appellant would stop taking medication if she were to leave the hospital
immediately. 

 The State next called K.D.C. to testify. K.D.C. did not know whether she was
pregnant or not. She had been told both that she was and that she was not, although she
knew that she previously had a hysterectomy. She recognized that she needed help for
her emotional problems, and that medication was part of the help that she needed. She
knew the dates that she had been hospitalized in Victoria, Texas, that she had been on
Haldol while she was hospitalized there, and that she was discharged without any
medications prescribed. Haldol made her sleepy when she took it in Victoria and also
when she took it at the hospital. She and her husband planned to return to Victoria to live
with her "adopted" father when she was released from the hospital. She was crying at
times during the hearing because she was scared by the legal process in which she was
involved, which included an appointed lawyer she had never met before and being in a
courtroom in Lubbock where she had never been before. She was also distressed
because she was locked up in a hospital and wanted to go home and "people won't let
me." She recognized that she was going to need medicine for a while and was willing to
take what Dr. Veits prescribed until she saw another psychiatrist. 

 After the State rested, K.D.C. called her husband, W.T.C., as a witness. W.T.C.
agreed that K.D.C. was very religious, as was he. He had known K.D.C. for 15 years and
she had never hurt herself or anyone else. When she was not with W.T.C., she stayed
pretty much to herself. She received psychological help in Victoria, from a doctor in
Midland, and while she had been in Lubbock. She had at one time been employed by
Skillet's Restaurant as a waitress, but had been fired. W.T.C. visited K.D.C. in the hospital
in Lubbock on a daily basis. He was not employed at the time of the hearing, but had been
in the past and planned on returning to work when he and K.D.C. returned to Victoria. He
confirmed that they had a place to stay with K.D.C.'s "adopted" father in Victoria. 

 The legislature has specified that proof of mental illness is insufficient reason for
a person to be involuntarily confined for inpatient mental health services. See HSC §
574.034(a), (d). To justify involuntary confinement, clear and convincing evidence must
be offered of (1) a recent overt act or pattern of behavior on the part of the proposed
patient that tends to confirm the proposed patient is likely to seriously harm herself or
others; or (2) the proposed patient's distress and deterioration of the proposed patient's
ability to function. See id. 

 We first consider K.D.C.'s legal sufficiency challenge to the evidence. In doing so,
we view the evidence and inferences from the evidence in the light most favorable to the
trial court's findings and disregard all contrary evidence and inferences. See Cazarez, 937
S.W.2d at 450. In reviewing the evidence according to such standard, we note that the
record contains meager evidence of any overt acts by K.D.C. Evidence was presented
that she stayed in a hospital in Victoria until she was discharged. The specific reason for
her hospitalization was not proved, although testimony supports the inference that it was
for mental problems. Following her release from the Victoria hospital, K.D.C. and her
husband left Victoria and somehow arrived in Midland. In Midland she was treated by a
doctor in some manner for her mental difficulties. She and her husband were walking from
Midland to Whiteface when deputies in Levelland picked her up and transported her to the
hospital in Lubbock. The only evidence introduced at the hearing as to what prompted the
deputies to pick her up was K.D.C.'s testimony that the deputies thought she was on street
drugs. The factual basis for such alleged belief by the deputies was not proved. K.D.C.
denied having used street drugs; she did not like them.

 The only evidence as to K.D.C.'s condition when she was admitted to the hospital
was given by Lair: K.D.C. was exhibiting rapid, pressured speech and religious ideations. 
The religious ideations continued during her hospital stay as evidenced by Lair's
descriptions of K.D.C.'s statements and biblical references in her conversations. 

 Dr. Veits testified to his conclusions that appellant was in a deteriorating condition
prior to the last few days before the hearing. The basis for his conclusion was her stay in
the Victoria hospital, although he did not testify to the reasons, if he knew, for her
hospitalization and no one disputed K.D.C.'s testimony that she had been discharged from
Victoria without medications or prescriptions, and on her "own recognizance." Dr. Veits
also was of the opinion that K.D.C. was a danger to herself because she was disorganized
and would be unable to function outside the hospital setting. However, he did not testify
to any specific overt act or pattern of behavior supporting his conclusion that K.D.C. was
disorganized and that the disorganization was so disruptive that it would render her unable
to function outside the hospital. Such foundation for his opinion is required. See In re
Breeden, 4 S.W.3d at 784; Goldwait, 961 S.W.2d at 434. (3) Although Lair and Dr. Veits
expressed subjective fears about K.D.C.'s ability to maintain a medication regimen and
care for herself outside the hospital, both Lair and Dr. Veits considered that K.D.C.'s
mental condition had recently improved as of the time of the hearing and neither testified
to recent specific, overt actions or pattern of behavior by K.D.C. to support their opinions
as to how she would conduct herself if not committed for inpatient services. The only
pattern of behavior testified to was Dr. Veits' reference to K.D.C.'s prior hospitalization in
Victoria. But, the bare fact of K.D.C.'s hospitalization in Victoria, without more, such as a
factual history giving the basis for the hospitalization, diagnoses made during the
hospitalization, treatment given K.D.C. during the hospitalization, and discharge
instructions and restrictions placed on K.D.C., if any, does not suffice to prove a recent
"pattern of behavior" in conjunction with her hospitalization in Lubbock when the only
evidence of the reason deputies brought her to the Lubbock hospital was K.D.C.'s
statement that they thought she was on street drugs, without relating any underlying facts. 
And, although Lair's opinions might well have been valid, the legislature has mandated
that more than conclusory opinions by experts is required before a person may be
involuntarily committed for inpatient mental health services. 

 K.D.C. recognized that she needed help and that medication was part of that help. 
No evidence contradicted the factual testimony of K.D.C. and her husband that they lived
and worked in Victoria, were then in Midland and walked to Levelland. No evidence was
presented of overt acts or pattern of behavior on the part of K.D.C. such as evidence that
either at or before the time she was brought to the hospital or at the time of the hearing
she had been physically abused or injured by others, had physically abused or injured
herself, was malnourished, refused to eat or sleep, was unable or unwilling to practice
proper hygiene, or had either discontinued using medications prescribed for her previously
or refused medications in the hospital except out of concern that she might be pregnant
and did not want to take any medicine which might be detrimental if she were pregnant. 
Proof of K.D.C.'s mental illness, which she admitted, religious ideations or psychotic
behavior, without more, does not fulfill the statutory requirement for ordering involuntary
inpatient mental health services under HSC § 574.034(a). See T.G., 7 S.W.3d at 252;
Broussard, 827 S.W.2d at 622; State for Interest of P.W., 801 S.W.2d at 3. 

 We conclude that the State offered legally insufficient evidence to prove an overt
act or continuing pattern of behavior by K.D.C. that tended to confirm (1) the likelihood of
serious harm to K.D.C. or others; or (2) deterioration of K.D.C.'s ability to function. See
HSC § 574.034(d); Cazarez, 937 S.W.2d at 450. Accordingly, the evidence is legally
insufficient to support the factual findings required by HSC §§ 574.034(a)(2)(A), (B), or
(C)(ii). Without such evidence, the trial court's order was not authorized by statute, and
was an abuse of discretion. See Bocquet, 972 S.W.2d at 21. Moreover, even if the record
evidence is legally sufficient to sustain either such finding, we conclude from the entire
record, as analyzed above, that a finding of such an overt act or continuing pattern of
behavior is manifestly unjust and based on factually insufficient evidence. See Lofton, 720
S.W.2d at 805. 

 We sustain K.D.C.'s first and second issues for legal insufficiency of the evidence. 
Sustaining such issues requires that we reverse the trial court order authorizing inpatient
mental health services. Generally, if an appellate court sustains a "no evidence" or "legal
insufficiency" issue, the appellate court must reverse and render judgment. See Vista
Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 176 (Tex. 1986). Thus, we also will render
judgment in favor of K.D.C. Because our disposition of her first two issues is determinative
of the appeal as to the trial court's order authorizing inpatient health services, we need not
address K.D.C.'s third and fourth issues. See Tex. R. App. P. 47.1. 

 An order authorizing the administration of psychoactive medication may be entered
only if the patient is under a valid order for temporary or extended mental health services
pursuant to HSC § 574.034 or § 574.035. See HSC § 574.106(a)(1). In the absence of
a valid order for temporary or extended mental health services, the order authorizing the
administration of psychoactive medication is not authorized by statute. Thus, having
sustained K.D.C.'s first two issues and having reversed the order authorizing inpatient
mental health services, we also sustain K.D.C.'s fifth issue and reverse the trial court's
order authorizing administration of psychoactive medication. See id. 

CONCLUSION

 We sustain K.D.C.'s issues one, two and five. We do not consider her third or
fourth issues. We reverse the order of the trial court authorizing temporary inpatient
mental health services and render an order that the State's application for court-ordered
temporary inpatient mental health services is denied. We reverse the order of the trial
court authorizing administration of psychoactive medications and render an order that the
State's application for order to authorize administration of psychoactive medications is
denied. See Tex. R. App. P. 43.2(c). 


 Phil Johnson

 Justice



Publish. 




1. Further references to provisions of the Health and Safety Code will be by reference
to "HSC § _."
2. Lair noted that hospital personnel at first were concerned that K.D.C. might be
pregnant and did not want to give her any medications until they were sure that she was
not pregnant, which was after the blood test.
3. For a discussion of appellate no evidence and legal insufficiency evidence review
of expert and expert opinion evidence, see Merrell Dow Pharmaceuticals, Inc. v. Havner,
953 S.W.2d 706, 712, 714 (Tex. 1997). 


aragraph, li.MsoListParagraph, div.MsoListParagraph
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpFirst, li.MsoListParagraphCxSpFirst, div.MsoListParagraphCxSpFirst
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpMiddle, li.MsoListParagraphCxSpMiddle, div.MsoListParagraphCxSpMiddle
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpLast, li.MsoListParagraphCxSpLast, div.MsoListParagraphCxSpLast
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoQuote, li.MsoQuote, div.MsoQuote
 {mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Quote Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:black;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoIntenseQuote, li.MsoIntenseQuote, div.MsoIntenseQuote
 {mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Intense Quote Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:.65in;
 margin-bottom:14.0pt;
 margin-left:.65in;
 line-height:115%;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD .5pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleEmphasis
 {mso-style-priority:19;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:gray;
 font-style:italic;}
span.MsoIntenseEmphasis
 {mso-style-priority:21;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleReference
 {mso-style-priority:31;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 text-decoration:underline;
 text-underline:single;}
span.MsoIntenseReference
 {mso-style-priority:32;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 letter-spacing:.25pt;
 font-weight:bold;
 text-decoration:underline;
 text-underline:single;}
span.MsoBookTitle
 {mso-style-priority:33;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 letter-spacing:.25pt;
 font-weight:bold;}
p.MsoTocHeading, li.MsoTocHeading, div.MsoTocHeading
 {mso-style-noshow:yes;
 mso-style-priority:39;
 mso-style-qformat:yes;
 mso-style-parent:"Heading 1";
 mso-style-next:Normal;
 margin-top:24.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 mso-bidi-language:EN-US;
 font-weight:bold;}
span.Heading1Char
 {mso-style-name:"Heading 1 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 1";
 mso-ansi-font-size:14.0pt;
 mso-bidi-font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 font-weight:bold;}
span.Heading2Char
 {mso-style-name:"Heading 2 Char";
 mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 2";
 mso-ansi-font-size:13.0pt;
 mso-bidi-font-size:13.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading3Char
 {mso-style-name:"Heading 3 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 3";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading4Char
 {mso-style-name:"Heading 4 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 4";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.Heading5Char
 {mso-style-name:"Heading 5 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 5";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;}
span.Heading6Char
 {mso-style-name:"Heading 6 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 6";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 font-style:italic;}
span.Heading7Char
 {mso-style-name:"Heading 7 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 7";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.Heading8Char
 {mso-style-name:"Heading 8 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 8";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;}
span.Heading9Char
 {mso-style-name:"Heading 9 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 9";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.TitleChar
 {mso-style-name:"Title Char";
 mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Title;
 mso-ansi-font-size:26.0pt;
 mso-bidi-font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;}
span.SubtitleChar
 {mso-style-name:"Subtitle Char";
 mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Subtitle;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 font-style:italic;}
span.QuoteChar
 {mso-style-name:"Quote Char";
 mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Quote;
 color:black;
 font-style:italic;}
span.IntenseQuoteChar
 {mso-style-name:"Intense Quote Char";
 mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Intense Quote";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
p.NewDocument, li.NewDocument, div.NewDocument
 {mso-style-name:"New Document";
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 mso-bidi-font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;
 mso-bidi-language:EN-US;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.EndnoteTextChar
 {mso-style-name:"Endnote Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Endnote Text";
 mso-bidi-language:EN-US;}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 mso-bidi-language:EN-US;}
span.pmterms11
 {mso-style-name:pmterms11;
 mso-style-unhide:no;
 color:black;
 font-weight:bold;
 font-style:normal;}
span.GramE
 {mso-style-name:"";
 mso-gram-e:yes;}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:Arial;
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:Arial;}
 /* Page Definitions */
 @page
 {mso-footnote-separator:url("07-10-0335-CR%20%20Opinion%202_files/header.htm") fs;
 mso-footnote-continuation-separator:url("07-10-0335-CR%20%20Opinion%202_files/header.htm") fcs;
 mso-endnote-separator:url("07-10-0335-CR%20%20Opinion%202_files/header.htm") es;
 mso-endnote-continuation-separator:url("07-10-0335-CR%20%20Opinion%202_files/header.htm") ecs;}
@page WordSection1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-title-page:yes;
 mso-footer:url("07-10-0335-CR%20%20Opinion%202_files/header.htm") f1;
 mso-paper-source:0;}
div.WordSection1
 {page:WordSection1;}
-->








NO. 07-10-0335-CR

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL E

 

 AUGUST 19, 2011



 

 



 

BRANDON MICHAEL PENNINGTON, APPELLANT

 

v.

 

THE STATE OF TEXAS, APPELLEE 



 

 



 

 FROM THE 181ST DISTRICT
COURT OF POTTER COUNTY;

 

NO. 43,164-B; HONORABLE JOHN B. BOARD, JUDGE



 

 



 

Before QUINN, C.J., and PIRTLE, J., and BOYD, S.J.[1]

 

 

MEMORANDUM OPINION

            Appellant, Brandon
Michael Pennington, appeals from a judgment revoking his deferred adjudication
community supervision, adjudicating him guilty of the offense of intentionally
and knowingly possessing a controlled substance, methamphetamine, in an amount
of 200 grams or more but less than 400 grams by aggregate weight and sentencing
him to fifty years confinement.[2]  Appellant's attorney filed a brief in
compliance with Anders v. California,
386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and certifies there are no
non-frivolous issues to appeal.  Agreeing
with appointed counsel's conclusion that the record fails to show any arguably
meritorious issue that could support the appeal, we affirm the trial court's
judgment. 

            In December
2000, Appellant was indicted for possession of a controlled substance,
methamphetamine, in an amount of 200 grams or more but less than 400 grams by
aggregate weight.  In June 2001, pursuant
to a plea agreement, Appellant pleaded guilty as charged in the indictment, and
received deferred adjudication community supervision for a period of ten years
and a $10,000.00 fine.  Appellant's
deferred adjudication was conditioned on his compliance with the specified
terms and conditions of the trial court's Order
Deferring Adjudication And Placing [Appellant] On
Community Supervision.

             In April 2010, the State filed a Motion to Proceed with Adjudication of Guilt
on Original Charge alleging three violations of the terms of Appellant's
deferred adjudication community supervision. 
In July 2010, the State filed an Amended
Motion to Proceed with Adjudication of Guilt on Original Charge (Motion)
adding two additional violations of the terms of Appellant's deferred
adjudication community supervision.  This
Motion was heard by the trial court in July 2010.  At the hearing, the State waived two
allegations and Appellant pled "true" to the remaining three
allegations.  Thereafter, the trial court
heard evidence from three deputies of the Potter County Sheriff's Office,
Appellant's Probation Officer and Appellant. 


            Based on Appellant's pleas of
"true" and the evidence provided at the hearing, the trial court
revoked Appellant's community supervision, adjudicated him guilty of possession
of a controlled substance as alleged in the December 2000 indictment and
assessed his punishment at fifty years confinement.  The trial court certified Appellant's right
to appeal, and he timely filed a notice of appeal.

            Thereafter, Appellant's appointed
appellate counsel filed a motion to withdraw certifying that he has conducted a
conscientious examination of the record and, in his opinion,
the record reflects no potentially plausible basis to support an appeal.  Anders, 386 U.S. at 744-45; In
re Schulman, 252 S.W.3d 403, 406 (Tex.Crim.App. 2008).  Counsel candidly discusses why, under
controlling authorities, the appeal is frivolous.  See
High v. State, 573 S.W.2d 807, 813 (Tex.Crim.App.
1978).  Counsel has also demonstrated
that he has complied with the requirements of Anders and In re Schulman
by (1) providing a copy of the brief to Appellant, (2) notifying him of his
right to file a pro se response if he
desired to do so, and (3) informing him of his right to file a pro se petition for discretionary
review.  In re Schulman, 252 S.W.3d at 408.[3]  Appellant did file a pro se response to his counsel's brief.[4]  The State filed no response to either Appellant's
brief or pro se response.

             By his Anders
brief, counsel raises two arguable issues. 
Counsel questions (1) whether Appellant's trial counsel was ineffective
because he permitted Appellant to plead "true" to three of the
State's allegations and (2) whether the trial court had jurisdiction to
consider the State's Motion.  Counsel
then candidly reviews each arguable issue and explains why no reversible error
is presented.  

            When we have an Anders brief by counsel and a pro
se response by an appellant, we have two choices.  We may determine that the appeal is wholly
frivolous and issue an opinion explaining that we have reviewed the record and
find no reversible error; Bledsoe v.
State, 178 S.W.3d 824, 826-27 (Tex.Crim.App. 2005) (citing Anders, 386 U.S. at 744), or, we may
determine that arguable grounds for appeal exist and remand the cause to the
trial court so that new counsel may be appointed to brief issues.  Id.
(citing Stafford v. State, 813 S.W.2d
503, 510 (Tex.Crim.App. 1991)). "Only after the issues have been briefed
by new counsel may a court of appeals address the merits of the
issues."  178
S.W.3d at 827. 

            We have reviewed counsel's arguments
and we have independently examined the entire record to determine whether there
are any non-frivolous issues which might support the appeal.  See
Penson v. Ohio, 488 U.S. 75, 80, 109 S.Ct. 346, 102 S.Ct. 346, 102 L.Ed.2d
300 (1988); In re Schulman, 252
S.W.3d at 409; Stafford v. State, 813
S.W.2d 503, 511 (Tex.Crim.App. 1991).  We
have found no such issues.  See Gainous v. State, 436
S.W.2d 137, 138 (Tex.Crim.App. 1969). 
After reviewing the record, counsel's brief and Appellant's pro se response, we find nothing in the
record that might arguably support the appeal. 
See Bledsoe,
178 S.W.3d at 826-27 (holding that it is constitutional error for an appellate
court to address nonmeritorious arguments raised in a pro se response to an Anders
brief).

            Here, the record provides no reason
to doubt that Appellant freely, knowingly, and voluntarily entered his plea of
"true" to three allegations contained in the State's Motion.  A plea of "true" to even one
allegation in the State's Motion is sufficient to support a judgment revoking
community supervision.  Cole v. State, 578 S.W.2d
127, 128 (Tex.Crim.App. 1979); Lewis v.
State, 195 S.W.3d 205, 209 (Tex.App.--San Antonio 2006, pet. denied).

            In addition, we note that the
judgment adjudicating guilt contains language ordering the Appellant to pay
court costs in accordance with an attached Bill
of Costs, which includes attorney's fees of $1,200.00.[5]  Court costs and the assessment of attorney's
fees pursuant to article 26.05(g) of the Texas Code of Criminal Procedure, as
reflected in a certified bill of costs, are effective regardless of whether or
not they were orally pronounced in open court or specifically stated in the
judgment.  Armstrong v. State, 340 S.W.3d 759,
766-67 (Tex.Crim.App. 2011).  The
assessment of attorney's fees must, however, be supported by sufficient evidence.  Without record evidence demonstrating a defendant's financial
ability to offset the costs of legal services, a trial court errs if it orders
reimbursement of court-appointed attorney's fees.  See Tex. Code Crim. Proc. Ann. art. 25.05(g) (West Supp.
2010); Mayer v. State,
309 S.W.3d 552 (Tex.Crim.App. 2010).  Here,
the record contains no evidence and no determination by the trial court that
Appellant has financial resources enabling him to pay such fees.  Accordingly, the District Clerk is ordered to
amend the Bill of Costs by deleting
the obligation to pay attorney's fees in the amount of $1,200.00.  See
Haney v. State, No. 07-09-0205-CR, 2010 Tex. App. LEXIS 7229, at *2
(Tex.App.--Amarillo Sept 1, 2010, no pet.) (mem. op., not designated for
publication) (modifying judgment by deleting order to
pay attorney's fees before affirming conviction in frivolous appeal under Anders). 


            Accordingly, counsel's motion to
withdraw is granted and the trial court's judgment is affirmed as modified by
the amended Bill of Costs.               

 

 

                                                                                                Patrick
A. Pirtle

                                                                                                      Justice  

Do not publish.











[1]John T. Boyd, Chief Justice (Ret.),
Seventh Court of Appeals, sitting by assignment.  Tex. Gov't Code Ann. § 75.002(a)(1) (West 2005).





[2]See Tex. Health
& Safety Code Ann. § 481.114(d) (West 2010).  This offense is a first degree felony punishable
by imprisonment for any term of not more than life or ninety-nine years or less
than five years and a fine not to exceed $10,000.00.  Tex. Penal Code § 12.32
(West 2011).  





[3]Notwithstanding that Appellant was
informed of his right to file a pro se
petition for discretionary review upon execution of the Trial Court's
Certification of Defendant's Right of Appeal, counsel must comply with Rule
48.4 of the Texas Rules of Appellate Procedure which provides that counsel
shall within five days after this opinion is handed down, send Appellant a copy
of the opinion and judgment together with notification of his right to file a pro se petition for discretionary
review.  Tex. R. App. P. 48.4; See In re Schulman, 252 S.W.3d at 408 n.22 & 411 n.35.





[4]By his pro se response, Appellant raises four issues.  He questions (1) whether his counsel was ineffective, (2) whether the trial court should have sua sponte ordered that Appellant
undergo a competency examination; (3) whether his sentence is excessive, (4)
whether the testimony offered by deputies of the Potter County Sheriff's
Department was biased and hearsay and (5) whether the trial court should have
held a suppression hearing.





[5]The
Clerk's Record includes a Judgment
Adjudicating Guilt, signed August 2, 2010, which references "Court
Costs: see attached," immediately followed by a Bill of Costs, dated August 6, 2010, which includes attorney's fees
in the sum of $1,200.00.