**In the Interest of George BREEDEN.**

**Nos. 04–99–00222–CV, 04–99–00224–CV.**

Court of Appeals of Texas,
San Antonio.

June 2, 1999.

Ralph Paul Behrens, Ingram, TX, for appellant.

David Marshall Motley, Kerr County Attorney, Kerrville, TX, for appellee.

Sitting: CATHERINE STONE, SARAH B. DUNCAN and KAREN ANGELINI, JJ.

## OPINION

STONE, Justice.

In this mental illness case we are asked to determine whether clear and convincing evidence supports appellant's court-ordered commitment to Kerrville State Hospital and his court-ordered treatment with psychoactive medication.

On March 23, 1999, the trial court, having found that George Breeden was mentally ill and unable to make a rational and

informed decision about whether or not to submit to treatment, ordered that he be committed to the Kerrville State Hospital for in-patient care for a period not to exceed 90 days. By separate order, the trial court also authorized treatment with psychoactive medication during Breeden's temporary hospitalization.

■ Breeden appeals from both orders, challenging the legal and factual sufficiency of the evidence to support the trial court's findings that protective custody and psychoactive medication are necessary. He also claims that his temporary commitment violates his constitutional right to freedom of speech, expression, and thought. Finding the evidence insufficient to support involuntary hospitalization, we reverse the trial court's orders.[1]

### INVOLUNTARY COMMITMENT

■ In Texas, a judge may not order temporary inpatient mental health services unless the judge finds from clear and convincing evidence that:

(1) the proposed patient is mentally ill; and

(2) as a result of that mental illness the proposed patient:

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others; or

(C) is:

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (Vernon Supp.1999). To be clear and convincing under this section, the evidence must include expert testimony and, unless waived, evidence of a *recent overt act or a continuing pattern of behavior* that tends to confirm either the likelihood of serious harm to the proposed patient or others, or the proposed patient's distress and the deterioration of the proposed patient's ability to function. *Id.* at § 574.034(d)(1), (2) (emphasis ours). Expert opinion recommending involuntary temporary commitment must be supported by a factual basis. *In re J.S.C.,* 812 S.W.2d 92, 95 (Tex.App.—San Antonio 1991, no writ). A bald diagnosis alone is insufficient to support commitment. *See id.*

■ Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction about the truth of the allegations sought to be established. *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979). The proof must be more than merely the greater weight of the credible evidence, but there is no requirement that

---

1. On April 15, 1999, Breeden was released from Kerrville State Hospital. Although Breeden is no longer subject to the trial court's orders, this appeal is not moot. *See State v. Lodge,* 608 S.W.2d 910, 911 (Tex. 1980). In *Lodge,* the Supreme Court held that the doctrine of mootness does not apply to appeals from involuntary commitments for temporary hospitalization. *Lodge,* 608

S.W.2d at 911–12. This conclusion was based, in part, on the observation that "commitment to a mental hospital 'can engender adverse social consequences to the individual' whether it is labeled a 'stigma' or if it is called something else." *Id.* at 912. This stigma continues even after release is obtained. *See id.*

the evidence be unequivocal or undisputed. *Id.*

In the instant case, the trial court determined that Breeden was mentally ill and that he should be involuntarily hospitalized because he will, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress; continue to experience deterioration of his ability to function independently; and remain unable to make a rational and informed decision as to whether or not to submit to treatment.[2] In his first point of error, Breeden argues that there is no evidence, or alternatively insufficient evidence, to support these necessary findings for involuntary commitment by clear and convincing evidence.

In considering Breeden's no evidence challenges, we review all the evidence in the light most favorable to the trial court's findings, indulging every reasonable inference in favor of those findings, *see Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998), to determine whether more than a scintilla of evidence supports the challenged findings. *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). In the context of the State's heightened burden of proof, we will sustain a no evidence challenge if the evidence is insufficient to produce in the mind of the factfinder a firm belief or conviction as to the truth of the facts. *Johnstone v. State,* 961 S.W.2d 385, 388 (Tex.App.—Houston [1st Dist.] 1997, no writ).

In considering Breeden's insufficient evidence challenges, we may set aside the findings only if a review of all the evidence demonstrates that the evidence which supports the findings is so weak as to be clearly wrong and manifestly unjust. *See Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). With these standards in mind, we turn to the evidence presented at the hearing for court-ordered mental health services.

### Medical Testimony

The State called Dr. Michael Lennhoff as its first witness. Dr. Lennhoff, a staff psychiatrist at Kerrville State Hospital, met with and evaluated Breeden on two occasions. Dr. Lennhoff tentatively diagnosed Breeden as suffering from a schizoaffective disorder—a thought disorder coupled with a mood or affective condition in the spectrum of schizophrenias. Dr. Lennhoff testified that Breeden is bothered by physical sensations described by Breeden as "pops and snaps," which Breeden believes are being transmitted to him by external agents. Dr. Lennhoff stated that Breeden has peculiar ideas, which Dr. Lennhoff characterized as psychotic in nature. Dr. Lennhoff testified that Breeden also hears bombing noises. Breeden refuses medication to relieve these aggravations. At this point, Dr. Lennhoff was of the opinion that Breeden was a harm to himself because he refuses medication and he is not eating well. Dr. Lennhoff admitted, however, he has no independent knowledge regarding Breeden's nutritional health. He learned that information from Breeden's medical chart. Dr. Lennhoff also expressed the opinion that Breeden could be a potential harm to others if his condition worsens. It was Dr. Lennhoff's belief that if not treated, Breeden would continue to suffer severe and abnormal mental, emotional, or physical distress, and

**2.** We note that the trial court's commitment order tracks the language of the former version of section 574.034(a)(2)(C). In 1997, subsection (a)(2)(C) was modified to explain that a patient's inability to function independently may be demonstrated by the patient's inability to provide basic needs of food, clothing, health, or safety. Aside from that edifying language and other minor semantic changes, the current version of 574.034(a)(2) reads the same.

would continue to experience deterioration of his ability to function independently.

Dr. Yousuf Allawala, Breeden's treating physician, testified next for the State. Dr. Allawala met with Breeden once and tentatively diagnosed him as suffering from chronic paranoid schizophrenia. He agreed with Dr. Lennhoff's opinion that Breeden's condition is coupled with a mood disorder. Dr. Allawala testified that Breeden is likely to cause serious harm to himself because he isolates himself and he is not eating adequately. With respect to Breeden's isolation, Dr. Allawala expounded:

> by isolating himself, it's not good—you know, he is not socially interacting with other people and, you know, may not be taking care of himself. You know, there's nobody to look after or be concerned about what—how he is eating, how is he living and—you know, if the person isolates himself, you know. If you have a lot of friends, maybe you know, your friends would—would be—would pick up on whether, you know, you are taking care of yourself. So that addresses that a person may—may neglect self and not be able to take care of himself by isolation.

Dr. Allawala admitted he did not have evidence that Breeden was not eating well, although he did state that Breeden was substantially underweight for his height and body type. Breeden weighs 120 pounds, standing at five feet, seven inches tall. Dr. Allawala opined that Breeden's paranoia may prevent him from going to the grocery store or buying his own groceries. Dr. Allawala noted that Breeden is a selective eater, and since his hospitalization, he has skipped meals altogether or has not eaten his entire meal. Dr. Allawala agreed with Dr. Lennhoff s assessment that Breeden would suffer severe and abnormal mental, emotional, or physical distress if he was not treated, and that if not treated, he would continue to deteriorate

in his ability to function independently. And it was Dr. Allawala's opinion that Breeden lacked the ability to make a rational and informed decision about whether to submit to treatment.

Dr. Vernon Grove, Jr. was called as the State's third expert witness. Dr. Grove testified that Breeden has a thought and mood disorder, but he was unwilling to diagnose Breeden's condition as paranoid schizophrenia. It was Dr. Grove's opinion that Breeden's diagnosis could not be certain without further evaluation. Dr. Grove concurred with the other testifying doctors that Breeden, if not treated, would continue to suffer severe and abnormal mental, emotional, or physical distress, and that Breeden would continue to deteriorate in his ability to function independently. When asked to state the way in which Breeden's illness manifests itself in behavior that might cause harm to Breeden or others, Dr. Grove, without clarification, responded, "passively."

### Lay Testimony

Elaine Glover, Breeden's caseworker of four months, testified next for the State regarding her impression of Breeden's condition and the underlying reasons for his recent hospitalization. Glover testified that Breeden's mental condition has declined in the past few months. He has become more paranoid and withdrawn. Recently Breeden wrote Glover a lengthy letter, complaining about harassment from external sources and asking for help to stop the disturbances. Breeden sent similar letters to his congressman and various governmental agencies, who have since contacted Glover about the irregular correspondence. Like Dr. Lennhoff, Glover noted that Breeden hears noises or voices, which he believes are inserted into his mind, and has delusional thoughts.

Glover also expressed concern regarding Breeden's refusal to take medication, his weight, and his sleeping habits. Breeden

refuses all medication, and this refusal, it appears, is based on his objection to the use of animals for human drug testing. Breeden's respect for animals also dictates the parameters of his diet. Breeden, a vegetarian, limits his diet to staples such as rice, beans, peanuts, fruit juice, and fresh vegetables. Glover was of the opinion that Breeden had lost weight in the last month. She agreed that there's a probability that Breeden will harm himself if he does not gain weight or begin eating a different diet. Glover, however, reminded the court on two occasions that she was not a medical expert. Her concern for Breeden's health was solely based on her personal observations. She testified that Breeden's nurse said he was forty-six pounds underweight. Breeden's nurse did not testify at this hearing. Finally, Glover expressed concern for Breeden's sleeping habits, indicating that he is only able to sleep a few hours a day. She opined that sleep deprivation could impair his judgment.

The fifth and final witness to testify for the State was Deputy Rusty Forbes. Recently, Forbes had the opportunity to observe and talk with Breeden when he transported him to the emergency room. In general, Forbes's testimony corroborated the other witness testimony regarding manifestations of Breeden's illness. For example, Forbes testified that Breeden hears popping sounds and voices, that he has a dislike for or mistrust of electronics, and that he seems to isolate himself from others. Forbes also testified about Breeden's feelings of kinship with animals, which Forbes learned prevents Breeden from driving because he does not like the fact that bugs meet their death on his windshield. Foster previously met and observed Breeden when he accompanied a caseworker out to his home to investigate a call about an injured animal. An upset Breeden contacted authorities about a goat badly wounded after getting caught in a fence.

On cross-examination, Forbes testified that he did not perceive any way in which Breeden would be a harm to himself or others. He also indicated that Breeden did not appear to be aggressive.

Breeden testified on his own behalf. A self-described vegan vegetarian, Breeden explained that his choice in diet has grown out of a kinship he feels towards fellow creatures. He testified that he eats three meals a day, with each meal consisting of "two grains, a legume or a nut serving to balance the protein—they're the amino acids, a serving of vegetable, and a serving of fruit." He indicated that he understood the importance of proper nutrition, and stated that he has never weighed more than 130 pounds. He currently weighs approximately 120 pounds. Breeden also detailed his daily routine, which generally includes attending to personal correspondence, business correspondence, and playing the guitar. He jogs frequently and cleans his house every couple of days. With respect to his lack of social interaction, Breeden explained:

[t]he solitude at this point, overall, was—was being (sic) a good thing, I think. I agree that social interaction is—is important also. And part of this week and a half of being confined here against my desire has—has helped me to see some of the social [interaction] that I was missing, except I still think that, overall, that the solitude is at this point a good—a good place for me.

Breeden further stated that, although isolated, he is able to care for himself. He is able to perform the activities of daily life such as eating, practicing basic hygiene, and maintaining a clean house. Breeden stated that he has never had any thoughts of hurting himself or others. Breeden has not been employed since August 1998. He is currently receiving Social Security Disability benefits.

On cross examination, Breeden confirmed that he hears popping noises, that

he does not sleep well, and that he refuses medication out of a respect for animal rights. On redirect examination, however, he stated that the noises or voices do not impair his ability to make a decision about whether to submit to treatment.

### Application of Law to Facts

As previously noted, the trial court's order of commitment was based upon the findings that Breeden is mentally ill and that he will, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress, and will continue to experience deterioration of his ability to function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment.

■ The testifying doctors uniformly agreed that Breeden is mentally ill. The tentative diagnoses varied in degree but were consistent in identifying Breeden's illness in the spectrum of schizophrenias. Breeden confirmed that he hears voices or noises, which he believes may be transmitted to him by external sources. All the witnesses indicated that Breeden has delusional thoughts. These delusional thoughts were recently committed to paper, and apparently alarmed all who received a copy of Breeden's letter. Dr. Lennhoff went so far as to characterize Breeden's thoughts as psychotic in nature. We find this evidence sufficient to produce in the mind of the fact-finder a firm belief or conviction that Breeden is mentally ill.

■ The doctors also uniformly expressed the opinion that Breeden, if not treated, will continue to suffer severe and abnormal mental, emotional, or physical distress, and will continue to experience deterioration of his ability to function independently and is unable to make a rational and informed decision about whether to submit to treatment. What is lacking from the record, however, is sufficient evidence of a *recent act or a continuing*

*pattern of behavior* that tends to confirm these assertions. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(d)(1), (2) (Vernon Supp.1999) (emphasis ours) (to be clear and convincing evidence under this section, record must include evidence of recent act or continuing pattern of behavior that tends to confirm proposed patient's distress, deterioration of his ability to function, and his inability to make rational and informed decision as to whether or not to submit to treatment). The State points to testimony regarding Breeden's weight loss and refusal of medicine, and argues that such evidence satisfies the statutory requirements necessary for involuntary commitment. We disagree.

Breeden's diet and weight were a concern to Drs. Lennhoff and Allawala and Glover, Breeden's caseworker. As previously noted, the five-foot-seven-inches tall Breeden is a vegetarian who currently weighs approximately 120 pounds. Both doctors testified that Breeden was not eating well, and indicated that his poor diet caused him to be a danger to himself. Glover expressed similar concerns, noting that Breeden appeared to have lost weight over the past few months. Dr. Allawala also made the blanket assertion that Breeden was underweight. Admittedly, however, the doctors had no independent knowledge that Breeden was not eating properly or losing weight due to a poor diet. Both doctors also acknowledged that medical testing did not reveal signs of malnourishment. Glover stated that Breeden's nurse said he was forty-six pounds underweight; notably, the nurse did not testify.

While this is some evidence that Breeden could be underweight, it does not constitute evidence of a continuing pattern of behavior that demonstrates Breeden's distress or his inability to function. It is undisputed that Breeden's dietary choices are linked to his concerns for animal rights. These concerns, however, which may or may not be born out of his mental

illness, have not prevented him from eating three seemingly well-balanced, albeit lackluster, meals a day at home. Breeden testified that he understood the importance of proper nutrition. His meals, which generally consist of two servings of grains, a legume or a nut serving, fruits and vegetables, appear to satisfy basic nutritional needs. Moreover, Breeden's exercise routine cannot be looked over as a factor that likely contributes to his slight weight.

Nor do we find compelling the argument that Breeden's refusal of medication satisfies the statutory requirements of section 574.034. This court has previously determined that refusal of medication that results in confusion and disorientation to the patient is insufficient evidence of an overt act or continuing pattern of behavior that demonstrates the patient's distress and the deterioration of the patient's ability to function. *See In re J.S.C.*, 812 S.W.2d at 96 (finding insufficient evidence of overt act or continuing pattern of behavior even where chronic schizophrenic patient, described as catatonic, delusional, disorientated, and hallucinating, refused medication). Other courts have reached similar conclusions despite strong evidence of mental illness. *See e.g., Johnstone*, 961 S.W.2d at 387, 389–90 (reversing commitment order of chronic schizophrenic patient who refused medication due to religious and cultural reasons because State failed to prove evidence of overt act or continuing pattern of behavior that demonstrated distress and patient's inability to function independently); *Broussard v. State*, 827 S.W.2d 619, 622 (Tex.App.—Corpus Christi 1992, no writ) (finding no evidence of overt act or continuing pattern of behavior that demonstrated distress and deterioration of patient's ability to function even though paranoid schizophrenic patient refused medication because she believed it was poisonous). The same conclusion is appropriate in the instant case.

Here, Breeden's refusal of medication, like his choice in diet, is based upon his deeply-felt concern for animal rights. This refusal of medication demonstrates not his distress or deterioration of his ability to function, but rather speaks to his ability to make a rational and informed choice about whether to submit to treatment. *See Broussard*, 827 S.W.2d at 622.

The State's reliance on both *Mezick v. State*, 920 S.W.2d 427 (Tex.App.—Houston [1st Dist.] 1996, no writ) and *Johnson v. State*, 693 S.W.2d 559 (Tex.App.—San Antonio 1985, no writ) does not change our conclusion. In *Mezick*, an insufficiency argument was rejected in the face of evidence that the proposed patient not only refused medication and had lost considerable weight in the months immediately preceding commitment, but had a history of manic behavior that had led to her frequent hospitalization. *Mezick*, 920 S.W.2d at 430–31.

In *Johnson*, this court reasoned that an individual who cannot make a rational decision to receive treatment poses a threat to his own well being. *Johnson*, 693 S.W.2d at 563. We do not quarrel with that sound logic. In place, however, are strict statutory requirements for the drastic measure of involuntary commitment for mental health services. While the record demonstrates that Breeden is ill and in need of medical attention, the record fails to contain evidence of a recent overt act or a continuing pattern of behavior that tends to confirm Breeden's distress and the deterioration of his ability to function. The trial court's decision is based not on the fact that Breeden posed a harm to himself, but rather that Breeden, if not treated, will continue to suffer severe and abnormal mental, emotional, or physical distress, and will continue to experience deterioration of his ability to function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment. Because the record does not

contain sufficient evidence of a recent act or a continuing pattern of behavior that tends to confirm these assertions, we sustain point of error number one. *See* Tex. Health & Safety Code Ann. § 574.034(d)(1), (2) (Vernon Supp.1999).

In light of our treatment of point of error number one, we need not address Breeden's constitutional challenge with regard to the commitment order. *See* Tex. R.App.P. 47.1. We also need not review the propriety of the order authorizing psychoactive medication. A trial court may not issue an order authorizing the administration of psychoactive medication unless the patient is under an order for temporary or extended mental health services. *See* Tex. Health & Safety Code Ann. § 574.106(a)(1) (Vernon Supp.1999). Because its authorizing order is reversed by this opinion, the order authorizing psychoactive medication cannot stand. *See id.*

The orders of the trial court are vacated.