NO. 12-01-00253-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


THE STATE OF TEXAS FOR
§
 APPEAL FROM THE 


THE BEST INTEREST AND
§
 COUNTY COURT AT LAW


PROTECTION OF J. A.
§
 CHEROKEE COUNTY, TEXAS

 


 Appellant J.A. ("J.A.") appeals from a judgment ordering his commitment for temporary
mental health services. A jury found that J.A. was mentally ill and that he met the criteria in section
574.034 of the Texas Health and Safety Code for court-ordered temporary mental health services. 
The trial court ordered J.A. committed to Rusk State Hospital for a period not to exceed ninety days. 
Appellant raises six issues on appeal, including the legal and factual sufficiency of the evidence and
various constitutional issues. We affirm.


Background


 On August 6, 2001, a social worker at Rusk State Hospital ("Rusk") filed an Application for
Court-Ordered Temporary Mental Health Services for J.A. The application stated that J.A. was
mentally ill and that he met the criteria in section 574.034 of the Texas Health and Safety Code for
court-ordered temporary mental health services. At the time the application was filed, J.A. was a
patient at Rusk, and the applicant was a member of his treatment team. On August 29, 2001, a jury
determined that J.A. met the statutory criteria for court-ordered temporary mental health services. 
On August 30, 2001, the trial court entered a final judgment for temporary court-ordered inpatient
mental health services for a period not to exceed 90 days. (1)


Burden of Proof and Standard of Review


 Section 574.034 of the Texas Health and Safety Code contains the criteria for court-ordered
temporary inpatient mental health services. The court may order a proposed patient to receive
temporary inpatient mental health services only if the factfinder concludes from clear and convincing
evidence that the proposed patient is mentally ill and also meets at least one of the additional criteria
set forth in section 574.034(a)(2). Specifically, subsection (a)(2) provides the factfinder must
conclude that as a result of mental illness, the proposed patient:



 is likely to cause harm to himself;


 


 is likely to cause serious harm to others; or



 

 is:



 (i) suffering severe and abnormal mental, emotional, or physical
distress;


 (ii) experiencing substantial mental or physical deterioration of the
proposed patient's ability to function independently, which is
exhibited by the proposed patient's inability, except for reasons
of indigence, to provide for the proposed patient's basic needs,
including food, clothing, health, or safety; and


 (iii) unable to make a rational and informed decision as to whether or
not to submit to treatment.



Tex. Health & Safety Code Ann. § 574.034(a)(2) (Vernon Supp. 2002).

 The State has the burden of establishing by clear and convincing evidence that the proposed
patient meets at least one of the additional criteria listed in section 574.034(a)(2) ("additional
criteria"). Mezick v. State, 920 S.W.2d 427, 430 (Tex. App.--Houston [1st Dist.] 1996, no writ). 
"Clear and convincing evidence" is an intermediate standard, falling between the preponderance of
the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal
proceedings. State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam). The Texas
Supreme Court has defined "clear and convincing evidence" as "that degree of proof which will
produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established." Addington, 588 S.W.2d at 570. When court-ordered temporary mental
health services are sought, an additional requirement for clear and convincing evidence is imposed.
To be clear and convincing under Subsection (a), the evidence must include expert testimony and,
unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to
confirm:



 the likelihood of serious harm to the proposed patient or others; or



 (2) the proposed patient's distress and the deterioration of the proposed patient's ability
to function.



Tex. Health & Safety Code Ann. § 574.034(d) (Vernon Supp. 2002).

 The clear and convincing standard does not alter the appropriate standard of review. In re
Caballero, 53 S.W.3d 391, 395 (Tex. App.--Amarillo 2001, pet. denied). In reviewing a legal
sufficiency or no evidence complaint, the appellate court must consider only the evidence and
inferences tending to support the challenged findings and disregard all evidence and inferences to
the contrary. If there is more than a scintilla of evidence to support the challenged findings, the no
evidence challenge fails. Leitch v. Hornsley, 935 S.W.2d 114, 118 (Tex. 1996). In the context of
the State's heightened burden of proof in a temporary commitment case, a no evidence challenge will
be sustained if the evidence is insufficient to produce in the mind of the factfinder a firm belief or
conviction as to the truth of the facts. In re Breeden, 4 S.W.3d 782, 785 (Tex. App.--San Antonio
1999, no pet.). In reviewing the factual sufficiency of the evidence, we consider all the evidence and
will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that
it is clearly wrong and manifestly unjust. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965);
Breeden, 4 S.W.2d at 785.



Sufficiency of the Evidence


 The jury found that J.A. was (1) likely to cause serious harm to others, (2) suffering severe
and abnormal mental, emotional, or physical distress, (3) experiencing substantial mental or physical
deterioration of his ability to function independently, which was exhibited by his ability to provide
for his basic needs, and (4) unable to make a rational and informed decision as to whether or not to
submit to treatment. In his sixth issue, J.A. contends that the State's evidence is legally and factually
insufficient to support the jury's findings. (2) 

Legal Insufficiency

 The State called four witnesses at the commitment hearing. The first was Dr. Harry
Thompson ("Dr. Thompson"), who had been J.A.'s treating physician since March 7, 2001. Dr.
Thompson testified about J.A.'s history as recorded in his medical records and also testified about
J.A.'s behavior since he arrived at Rusk. According to Dr. Thompson, J.A. was admitted to a
Houston hospital after his mother called the police because of his aggression and threats toward her. 
On February 13, 2001, the Houston hospital referred J.A. to Rusk. 

 Dr. Thompson concluded J.A. had been suffering from "schizophrenia paranoid type,
continuous with prominent negative symptoms" for at least a year and also has an "anti-social
personality disorder." Dr. Thompson noted that J.A. had a two- or three-year history that includes
incidents of violence and aggression toward his mother and his sister. He also described one occasion
on which J.A. was out in public with a machete and chased his girlfriend and her child, who was an
infant. After arriving at Rusk, J.A. refused to confront the seriousness of his threats and violence and
the need for attention to the problem. Dr. Thompson described J.A. as being very evasive and stated
that J.A. minimizes the occurrences or "puts his own spin on it from his distorted viewpoint."

 Dr. Thompson also related that on June 26, 2001, a social worker heard J.A. threaten to kill
her, Dr. Thompson, and the rest of the staff. As a result of the threats, J.A. was moved to another
unit. However, J.A. denied making the threats and, when questioned about the incident by members
of his treatment team, said it "sounds like someone is stretching the truth." On cross-examination,
Dr. Thompson also testified that an episode occurred on June 28, 2001 in which J.A. was fighting
the staff and other patients. The incident was sufficiently serious that J.A. received an emergency
injection to stop the aggression, and the staff and patients involved required medical attention. 

 According to Dr. Thompson, J.A.'s behavior became more rigid than ever after the threats,
and he seemed defiant in his intention not to change. He refused to go to classes or interact with
other individuals on the ward and started to actively refuse any type of treatment except his
medication, which he took "passively." Although J.A. has not told Dr. Thompson that he intends
to hurt his mother or his sister, he has given no indication that anything has changed. J.A. has denied
that he has a problem, and Dr. Thompson concluded that J.A. would not take his medication outside
of the hospital because of his lack of insight and understanding. Based on J.A.'s history and his
behavior and attitude since he was admitted to Rusk, Dr. Thompson concluded that he poses a
danger to his immediate family and to society.

 Teresa Cunio ("Cunio"), a licensed social worker at Rusk, testified that she was the social
worker who heard the threats Dr. Thompson described in his testimony. She stated that J.A. told her
he would get out of the hospital and that he was going to kill her, Dr. Thompson, and others. 
Because she had spoken with his mother and knew about the incident with the machete and about
J.A.'s violence toward his sister, she took his threats seriously. Cunio also stated that two weeks
prior to the threats, notes in his chart indicate that he was uncooperative, easily agitated, and not
getting along well with the other clients.

 Jim Larue ("Larue"), a licensed social worker at Rusk and member of J.A.'s treatment team,
testified that he had explained to J.A. what he must accomplish before he could go back into the
community. Although J.A. can recite what he needs to do, he has not reached a point where he is
following through. Larue also related his conversations with J.A.'s mother, who gave him some of
the details of J.A.'s history. She told Larue that the first incidents she noticed were times in which
J.A. stared at her, but would not talk. During those times, she was afraid to say anything because
he was so angry with her. At some point, J.A. became assaultive, and his mother described incidents
in which he grabbed her by the throat, held her up in the air, threw her up against the refrigerator,
and bruised her with his fingernails around the neck. She also told Larue that even when she and
J.A. were in different parts of the house, she felt caged in as though they were playing "cat-and-mouse games." On cross-examination, Larue testified that J.A. has not assaulted anyone else, but
has been withdrawn and refused to participate in treatment.

 Laverne Martin ("Martin"), J.A.'s mother, testified that her son is very angry and that he is
on drugs, although she does not know what kind. She stated that when he is angry, he goes into a
rage "like anything he sees in front of him makes him mad and he will kill it." She described a
number of incidents in which J.A. became angry and violent. On one occasion, he held his fifteen-year-old sister by the neck. When Martin tried to intervene, he pushed her against the table in the
bedroom. With the passage of time, J.A. became more and more violent to his sister and would
threaten or assault her with anything close to him. During those episodes, Martin saw him use
various items, including a bat, shoes, and his hand. He also became violent toward Martin, telling
her that she had spoiled his sister. After J.A. threatened to kill his sister with a baseball bat, Martin
sent her to live with her dad, who was Martin's former husband. 

 Martin also testified that she once saw J.A. leave the house with a machete that he had
wrapped in a sheet. Although she thought he was "going after" his girlfriend, she later learned that
he "went after" his dad, his grandfather, and his uncle. On another occasion, J.A. threw an iron at
Martin because he thought she had called her mother about his actions. He also told Martin that he
would kill her if she ever put him in a "crazy house" and has told her since he was admitted to Rusk
that he is never going to change. Martin mentioned another incident in which J.A. became so angry
at her mother that he almost hit her in the face. On other occasions, he has hit his dad, punched his
grandfather in the face, and pushed down his other grandmother.

 J.A. testified at the hearing and stated that he had been involved in several fights with other
clients since being admitted to Rusk. He described one incident as a fight over cigarettes and another
as the result of someone breaking his radio and refusing to pay for it. 

 In summary, the record shows that J.A. had a two or three-year history of threats and violence
toward his mother, his sister, and other individuals. Since his hospitalization at Rusk, he has
threatened to kill members of the Rusk staff and others and has been involved in several altercations
with other clients. In one of those incidents, J.A. was administered an emergency injection to stop
the aggression and others involved in the altercation received medical treatment. That evidence is
sufficient to establish a continuing pattern of behavior that tends to confirm J.A. is likely to cause
serious harm to others. We therefore hold that the evidence is sufficient to produce in the mind of
the jury a firm belief or conviction that J.A. is likely to cause serious harm to others as a result of his
mental illness. Thus, the evidence is legally sufficient to support the jury's finding on that issue, and
the statutory criteria for commitment have been satisfied. Because the jury was required to
determine that J.A. met only one of the three additional criteria, we do not address the other findings
of the jury. Goldwait v. State, 961 S.W.2d 432, 453 (Tex. App.--Houston [1st Dist.] 1997, no writ).
To determine the factual sufficiency of the evidence, we now consider the rest of the record.

 J.A. related his version of the events the other witnesses described in their testimony. He
stated that on the night of the incident that precipitated Martin's call to the police, he was not
aggressive or threatening toward his mother. He admitted, however, that he "was making a lot of
noise" and that he was "slamming the French door." J.A. also admitted that he and his sister do not
get along and that they "fight back and forth." According to J.A., his sister aggravates him "just like
a regular, normal sister aggravates any other brother," and he denied threatening her. He also denied
having any desire to hurt his sister or anyone else. Further, he testified that "I haven't gotten angry
with my mom at all," and denied threatening his sister. 

 J.A. characterized the fights with other residents as "stupid fights" and stated that hospital
personnel "switched his words around" when they related the statements he made about killing the
social worker, Dr. Thompson, and others. He denied talking about killing anyone, but stated that he
said those people "needed to be hurt in the way that I was hurt." He explained that he meant those
people should be hurt "by putting them inside a hospital against their will and holding them and
having medication forced into them every single day. . . ." 

 J.A. denied all of the other incidents of violence mentioned during the hearing and also
denied that he had any problems with anger. However, he admitted that he "got angry right when
they put them three months on me," which was a reference to a second temporary commitment
immediately following the first. He further testified that he did not have a machete and that his
mother could not have seen him leave the house with a machete because she was in the restroom
when he left. Although he does not like to take medication, he agreed that he would take it if he
were allowed to leave Rusk. J.A. presented no other witnesses on his behalf. 

 From our review of all the evidence, we conclude that the jury's finding that J.A. is likely to
cause serious harm to others is not so contrary to the overwhelming weight of the evidence that it
is clearly wrong and manifestly unjust. Thus, the evidence is factually sufficient to support the jury's
finding. Because we hold that the evidence is both legally and factually sufficient, we overrule J.A.'s
sixth issue.


Constitutional Issues


 In his first and second issues, J.A. contends that section 574.034 violates his right to due
process of law as guaranteed by article I, section 19 of the Texas Constitution and by the Fourteenth
Amendment to the United States Constitution. (3) Specifically, J.A. contends that section 574.034
refers to a patient's "ability to function independently," but does not define "ability." He further
contends that the statute does not contain a means for determining when a proposed patient is
"unable" to make a rational and informed treatment decision. In his third and fourth issues, J.A.
argues that for the reasons articulated in his first and second issues, section 574.034 violates his right
to equal protection guaranteed by article I, sections 3 and 3a of the Texas Constitution and by the
Fourteenth Amendment to the United States Constitution. 

 In reviewing the record, we note that J.A. did not make his due process and equal protection
arguments in the trial court. As a rule, a constitutional claim must have been asserted in the trial
court to be raised on appeal. Dreyer v. Greene, 871 S.W.2d 697, 698 (Tex. 1993). That rule applies
here, and therefore J.A. has not preserved those claims for our review. Accordingly, we overrule
J.A.'s first, second, third, and fourth issues.

 In his fifth issue, J.A. argues that his trial counsel's failure to challenge the constitutionality
of section 574.034 and the resulting waiver of the arguments presented in his first four issues
constitutes ineffective assistance of counsel. "[T]he subject of an involuntary civil commitment
proceeding has the right to effective assistance of counsel at all significant stages of the commitment
process." Ex parte Ullmann, 616 S.W.2d 278, 283 (Tex. Civ. App.--San Antonio 1981, writ
dism'd). However, we have found no case that expressly declares the appropriate standard for
determining whether assistance of counsel was ineffective in an involuntary civil commitment
proceeding. Therefore, we look to the general standards established for effective assistance of
counsel in criminal cases and determine that to prevail on his fifth issue, J.A. must meet the two-pronged test articulated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d
674 (1984).

 To show that his trial counsel was ineffective, J.A. must demonstrate that counsel's
performance was deficient. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. In order to satisfy that
prong, J.A. must demonstrate that counsel's performance fell below an objective standard of
reasonableness, as judged on the facts of his particular case and viewed at the time of counsel's
conduct. Id. at 688-90, 104 S. Ct. at 2064-66. Further, counsel is presumed to have rendered
adequate assistance and made all significant decisions in the exercise of reasonable professional
judgment. McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996). Second, J.A. must
show that counsel's performance prejudiced his defense at trial. Strickland, 466 U.S. at 692, 104
S. Ct. at 2067. "It is not enough for the Appellant to show that the errors had some conceivable
effect on the outcome of the proceeding." Id. at 693, 104 S. Ct. at 2067. Rather, he must show there
is a reasonable probability that the result of the proceeding would have been different but for the
errors made by counsel. Id. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability
sufficient to undermine confidence in the outcome." Id. "An allegation of ineffectiveness must be
firmly founded in the record, and the record must affirmatively demonstrate the alleged
ineffectiveness." McFarland, 928 S.W.2d at 500. Failure to make the required showing of either
deficient performance or sufficient prejudice defeats the ineffectiveness claim. Id.

 J.A. has a difficult burden in proving ineffective assistance of counsel. As the court of
criminal appeals explained in Thompson v. State, 9 S.W.3d 808 (Tex. Crim. App. 1999):


 A substantial risk of failure accompanies an appellant's claim of ineffective assistance on direct
appeal. Rarely will a reviewing court be provided the opportunity to make its determination on direct
appeal with a record capable of providing a fair evaluation of the merits of the claim involving such
a serious allegation. In the majority of instances, the record on direct appeal is simply undeveloped
and cannot adequately reflect the failings of trial counsel. 



Id. at 813-14 (citations omitted). Thus, to successfully demonstrate counsel's ineffectiveness, an
appellant must generally present evidence, usually through a motion for new trial (4) or a habeas corpus
proceeding, illustrating trial counsel's strategy. Id.; Kemp v. State, 892 S.W.2d 112, 115 (Tex.
App.--Houston [1st Dist.] 1994, pet. ref'd). 

 In the case at hand, we have no evidence from counsel's perspective concerning whether she
considered challenging the constitutionality of section 574.034 and, if so, the reasons she decided
not to do so. Generally, when the record contains no evidence of the reasoning behind counsel's
conduct, we cannot conclude counsel's performance was deficient. See Jackson, 877 S.W.2d at 771. 
If there is any plausible basis for trial counsel's actions, we are not required to speculate on the
reasons for counsel's actions when confronted with a silent record. Id.; McCoy v. State, 996 S.W.2d
896, 900 (Tex. App.--Houston [14th Dist.] 1999, no pet.). However, if a silent record demonstrates 
that no reasonable trial attorney could have made the challenged trial decisions, to hold counsel
ineffective is not speculation. See Vasquez v. State, 830 S.W.2d 948, 950-51 (Tex. Crim. App.
1992); McCoy, 996 S.W.2d at 900.

 Because the record contains no evidence relating to counsel's consideration of the
constitutional issues J.A. seeks to assert on appeal, we are unable to determine that the failure to
raise the issues in the trial court constitutes ineffective assistance of counsel. Although J.A. contends
that the mere failure to raise those issues is sufficiently egregious to satisfy the first prong of
Strickland, he has cited no authority that supports his contention and we are not aware of any. Cf.
Vaughn v. State, 931 S.W.2d 564, 566 (Tex. Crim. 1996) (claim of ineffective assistance of counsel
for failure to object requires showing that if trial counsel had objected, the trial judge would have
committed error in refusing to sustain the objection). Therefore, J.A. has failed to show that his
counsel's performance fell below the objective standard of reasonableness.

 Even if we agreed that trial counsel's performance was deficient, however, J.A. has failed
to make any showing that he was prejudiced as a result. J.A. argues that "[h]ad trial counsel objected
to the constitutionality of the referenced statutes, and presented arguments in support thereof, the
trial court would have had the opportunity to rule on same and the subsequent judgment on appeal
herein may never had [sic] occurred." However, he presents no argument and cites no authority from
which we can determine that counsel's constitutional challenge, if raised, would have been sustained
by the trial court. Cf. id. As a result, J.A. has failed to show that there is a reasonable probability that
the result of the proceeding would have been different but for the alleged error made by counsel. 
Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Accordingly, we overrule J.A.'s fifth issue.


Conclusion


 Based upon our review of the record, we hold that the evidence was legally and factually
sufficient to support the jury's finding that as a result of his mental illness, J.A. was likely to cause
serious harm to others. We further hold that J.A. has not shown his counsel was ineffective during
his temporary commitment hearing. The judgment of the trial court is affirmed.


 SAM GRIFFITH 

 Justice



Opinion delivered April 25, 2002.

Panel consisted of Davis, C.J., Worthen, J., and Griffith, J.

















(DO NOT PUBLISH)
1. The ninety-day commitment period has expired, but this appeal is not moot. In State v. Lodge, 608 S.W.2d
910, 911 (Tex. 1980), the Texas Supreme Court held that the doctrine of mootness does not apply to appeals from
involuntary commitments.
2. J.A. does not challenge the jury's finding that he is mentally ill.
3. In his argument, J.A. refers to "§ 574.034, et seq." However, his argument pertains to the language of section
574.034 only.
4. The timetable the legislature created for appeals from orders requiring mental health services does not
contemplate the filing of a motion for new trial. Johnstone v. State, 22 S.W.3d 408, 410 (Tex. 2000). However, a
person who is receiving in-patient mental health services, whether voluntarily or court-ordered, may seek a writ of habeas
corpus. Tex. Health & Safety Code Ann. § 572.003(a) (Vernon Supp. 2002); Tex. Health & Safety Code Ann.
§ 576.003 (Vernon 1992).