In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00147-CV
______________________________


Â 
Â 
THE STATE OF TEXAS FOR THE BEST INTEREST 
AND PROTECTION OF R.G.
Â 
Â 


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the County Court at Law
Hunt County, Texas
Trial Court No. M-08680


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Justice Carter


MEMORANDUM OPINION

Â Â Â Â Â Â Â Â Â Â Â Â R.G. appeals the trial court's order committing him to Terrell State Hospital inpatient mental
health services for a period not to exceed ninety days. He argues that the evidence is legally and
factually insufficient to support the trial court's order. Having concluded that the evidence is both
legally and factually insufficient, we reverse the trial court's order. 
I.Â Â Â Â Â Â Â Â Â FACTUAL BACKGROUND
Â Â Â Â Â Â Â Â Â Â Â Â In support of its application for court-ordered temporary mental health services, the State
presented the certificates of Drs. Gary Fagan and Rakesh Chadalavada. Dr. Fagan noted that R.G.
was severely depressed and "has not been eating, drinking or taking medications." Dr. Fagan also
noted that R.G. was "stating he wants to die." Dr. Chadalavada also made note of R.G.'s depression
and his refusal to eat or take medication. The doctor also wrote that R.G. "seems to be responding
to internal stimuli." 
Â Â Â Â Â Â Â Â Â Â Â Â At the hearing, the State presented the testimony of Dr. Chadalavada, who testified that R.G. 
had been diagnosed with bipolar disorder with psychotic features.


 When asked on direct
examination if R.G. was posing a serious harm to himself, Dr. Chadalavada explained that R.G. had
"stopped eating food at the home and he is paranoid that his food is being poisoned, and he hasn't
been taking care of himself." The doctor testified that R.G. does not pose a risk of harm to others. 
Â Â Â Â Â Â Â Â Â Â Â Â Dr. Chadalavada also testified he believes that R.G.'s mental, emotional, and physical
abilities would deteriorate. The doctor explained the basis for his opinion: "[I]f he continues to not
eat, not take care of himself, seems to be responding to internal stimuli, he's paranoid, he would
gradually deteriorate." Dr. Chadalavada conceded that R.G. was able to perform basic functions
such as feeding and bathing himself, but noted that R.G. must be pressured to do so. The doctor
went on to testify that R.G. "is eating on and off with Ensure" and that the staff indicated "he has
been attempting to eat most of his meals in the last 24 to 48 hours." Dr. Chadalavada further
testified that he feels R.G. is unable to make rational decisions as to whether he should submit to
treatment and whether he should take medication. The doctor described how R.G. refused to take
one certain medication the preceding week. Dr. Chadalavada did not testify regarding the allegations
that R.G. stated he "wanted to die." 
Â Â Â Â Â Â Â Â Â Â Â Â On cross-examination, Dr. Chadalavada explained that he offered R.G. the drug Risperdal
once the preceding week. The doctor disclosed to R.G. the side effects of one particular medication
and, when R.G. indicated he did not want to take that medication, the doctor asked R.G. if he wanted
to try some of the other medication available for his illness. R.G. told the doctor he did not want to
take any medication.
Â Â Â Â Â Â Â Â Â Â Â Â R.G. testified that he had been eating, although he did not eat everything he was given. With
respect to the one medication he discussed with Dr. Chadalavada, R.G. explained that he did not feel
as though he needed the medication and that, having taken the medication in the past, did not care
for "some" of its side effects. R.G. denied having expressed suicidal thoughts. He also testified that,
while he has refused some food, he has not refused food to the point that he felt weak or passed out. 
He also expressed a willingness to consider taking some medication for his condition. 
Â Â Â Â Â Â Â Â Â Â Â Â In its order of commitment, the trial court found that R.G. "is likely to cause serious harm
to self." Additionally, the trial court found that he "will, if not treated, continue to suffer severe
abnormal mental, emotional or physical distress, is experiencing substantial mental or physical
deterioration of [his] ability to function independently, . . . and is unable to make a rational and
informed decision as to whether or not to submit [to] treatment." 
II.Â Â Â Â Â Â Â APPLICABLE LAW
A.Â Â Â Â Â Â Â Â Statutory Requirements
Â Â Â Â Â Â Â Â Â Â Â Â A court may order a proposed patient to receive temporary inpatient mental health services
only if the fact-finder concludes from clear and convincing evidence that the proposed patient is
mentally ill and also meets at least one of the additional criteria set forth in Section 574.034(a)(2):
Â 
(2) as a result of that mental illness the proposed patient:
Â 
(A) is likely to cause serious harm to himself;
Â 
(B) is likely to cause serious harm to others; or
Â 
(C) is:
(i) suffering Â severe Â and Â abnormal Â mental, Â emotional, Â or physical distress;
(ii) experiencing substantial mental or physical deterioration of the proposed
patient's ability to function independently, which is exhibited by the proposed
patient's inability, except for reasons of indigence, to provide for the proposed
patient's basic needs, including food, clothing, health, or safety; and
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â (iii) unable to make a rational and informed decision as to whether or not to
submit to treatment.

Tex. Health & Safety Code Ann. Â§ 574.034 (Vernon 2003). Here, the trial court's written order
affirmatively found the State's allegations under (A) and (C) to be true. 
B.Â Â Â Â Â Â Â Â The State's Burden
Â Â Â Â Â Â Â Â Â Â Â Â The evidentiary standards for involuntary commitment are high. Harris v. State, 615 S.W.2d
330, 333 (Tex. Civ. App.âFort Worth 1981, writ ref'd n.r.e.). The State has the burden of
establishing by clear and convincing evidence that the proposed patient meets at least one of the
additional criteria listed in Section 574.034(a)(2). See Mezick v. State, 920 S.W.2d 427, 430 (Tex.
App.âHouston [1st Dist.] 1996, no writ). Clear and convincing evidence is "that degree of proof
which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established." State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979).
Â Â Â Â Â Â Â Â Â Â Â Â When the State seeks court-ordered temporary mental health services under subsection (a),
as it did here, specific requirements for clear and convincing evidence are imposed: the evidence
must include expert testimony and, unless waived, evidence of a recent overt act or a continuing
pattern of behavior that tends to confirm:
(1) the likelihood of serious harm to the proposed patient or others; or
(2) the proposed patient's distress and the deterioration of the proposed patient's
ability to function.

Tex. Health & Safety Code Ann. Â§ 574.034(d). An expert diagnosis, without more, is not
sufficient to confine a patient for compulsory treatment. Mezick, 920 S.W.2d at 430. The State
cannot meet its burden of proof without presenting evidence of the behavior of the proposed patient
that provides the factual basis for the expert opinion. Id. The recent overt act or continuing pattern
of behavior shown by the State must also relate to the criterion on which the judgment is based. See
T.G. v. State, 7 S.W.3d 248, 252 (Tex. App.âDallas 1999, no pet.).
C.Â Â Â Â Â Â Â Â Standards of Review
Â Â Â Â Â Â Â Â Â Â Â Â To review the legal sufficiency of the evidence where the burden of proof is clear and
convincing evidence, we consider all of the evidence in the light most favorable to the finding to
determine whether a reasonable trier of fact could have formed a firm belief or conviction that its
findings were true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the trier
of fact resolved disputed facts in favor of its finding if a reasonable trier of fact could do so, and
must disregard all evidence that a reasonable trier of fact could have disbelieved or found to be
incredible. Id.
Â Â Â Â Â Â Â Â Â Â Â Â In reviewing factual sufficiency challenges, we review all the evidence in the record, both
that in support of and contrary to the trial court's findings. In re C.H., 89 S.W.3d 17, 27â29, 45
(Tex. 2002). We must give due consideration to evidence the trier of fact could reasonably have
found to be clear and convincing. Id. at 25. Under the clear and convincing standard, we determine
whether the evidence is such that the trier of fact could reasonably form "a firm belief or conviction"
as to the truth of the allegations sought to be established by the State. Id. We must consider whether
disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed
evidence in favor of its finding. J.F.C., 96 S.W.3d at 266. The trial court as the trier of fact is the
exclusive judge of the credibility of the witnesses and the weight to be given their testimony. In re
Estate of Canales, 837 S.W.2d 662, 669 (Tex. App.âSan Antonio 1992, no writ).
III.Â Â Â Â Â Â ANALYSIS
Â Â Â Â Â Â Â Â Â Â Â Â R.G. does not challenge the determination that he was mentally ill. See Tex. Health &
Safety Code Ann. Â§ 574.034(a)(1). However, he challenges the evidence supporting the findings
required pursuant to Section 574.034, arguing that the State failed to present sufficient evidence of
a recent overt act or continuing pattern of behavior that tends to confirm the likelihood of serious
harm to R.G. or that tends to confirm R.G.'s distress and the deterioration of his ability to function.


 
We must, therefore, determine whether the State presented sufficient evidence of such nature.
A.Â Â Â Â Â Â Â Â Stated Desire to Die
Â Â Â Â Â Â Â Â Â Â Â Â In Dr. Fagan's certificate, he referred to the family's report that R.G. had been "stating he
wants to die." This phrase is the only reference to such statements. Dr. Chadalavada did not testify
to any such statements by R.G. From this short, general reference in Dr. Fagan's certificate, we
cannot determine the context in which R.G. may have made statements to this effect. And, certainly,
there is no evidence R.G. attempted suicide or purposely harmed himself. So, we cannot conclude
that Dr. Fagan's five-word notation in his certificate constitutes evidence of a recent overt act or
continuing pattern of behavior that tends to confirm the likelihood of serious harm to R.G. or a
substantial deterioration of R.G.'s ability to function independently. See Tex. Health & Safety
Code Ann. Â§ 574.034(d).
B.Â Â Â Â Â Â Â Â Not Taking Care of Himself
Â Â Â Â Â Â Â Â Â Â Â Â Dr. Chadalavada testified that R.G. was not taking care of himself. The San Antonio court
analyzed similar testimony in In re J.S.C., 812 S.W.2d 92, 96 (Tex. App.âSan Antonio 1991, no
writ). There, the doctor testified the patient was "not able to take care of himself outside the
hospital," but gave no specific facts to support the statement. Id. The court pointed out that the
doctor did not state what specific tasks the patient was unable to do. Likewise, we cannot determine
what specific acts or omissions to which Dr. Chadalavada refers by his general observation. 
Therefore, we will address the two more specific acts of which the State presented evidence: R.G.'s
refusal to eat and his refusal to take medication. We will measure such refusal against the statutory
requirements of Section 574.034(d) to determine whether the State's evidence was clear and
convincing. 
C.Â Â Â Â Â Â Â Â Refusal to Eat
Â Â Â Â Â Â Â Â Â Â Â Â A proposed patient's refusal to eat may be sufficient evidence to support an order for
temporary commitment when there is specific evidence of the patient's refusal and the resulting harm
that refusal has caused to the proposed patient. Compare K.T. v. State, 68 S.W.3d 887 (Tex.
App.âHouston [1st Dist.] 2002, no pet.) (holding that evidence was insufficient when State
presented evidence of patient's refusal to eat while hospitalized but failed to show that her refusal
resulted in malnutrition or other harm) with State ex rel. Y.A-Y., No. 12-03-00242-CV, 2004 Tex.
App. LEXIS 2961 (Tex. App.âTyler Jan. 8, 2004) (mem. op.) (holding that evidence was sufficient
when State presented evidence of patient's refusal to eat and drink for days at a time and resulting
weight loss and risk of dehydration).
Â Â Â Â Â Â Â Â Â Â Â Â In K.T., the State presented evidence that K.T. had "stopped eating food at the home and she
is paranoid that her food is being poisoned, and she hasn't been taking care of herself." K.T., 68
S.W.3d at 891â92. The K.T. court noted that there was no evidence that K.T. had stopped eating
outside the hospital or that her refusal had resulted in malnutrition or other harm.


 Id. at 893. The
court did not dispute the evidence of K.T.'s mental illness, but it reiterated that such evidence alone
will not satisfy the statutory requirements. See id. (citing Broussard v. State, 827 S.W.2d 619, 622
(Tex. App.âCorpus Christi 1992, no writ)).
Â Â Â Â Â Â Â Â Â Â Â Â Similarly, the San Antonio court concluded that the evidence was insufficient in In re
Breeden, 4 S.W.3d 782, 788â89 (Tex. App.âSan Antonio 1999, no pet.). The doctor in Breeden
testified that the patient was not eating properly and was refusing medication. Id. at 786. The court
reversed the trial court's order based on insufficiency of the evidence, however, since the State failed
to present evidence that such acts or omissions resulted in malnutrition. Id. at 788â89. The court
also noted that the evidence showed that the patient's dietary decisions were based on his concern
for animal rights. Id. at 788.
Â Â Â Â Â Â Â Â Â Â Â Â In Y.A-Y., the State presented expert testimony diagnosing Y.A-Y. as mentally ill and
describing his behavior and some specific acts. See Y.A-Y., 2004 Tex. App. LEXIS 2961, at *3â5. 
Most relevant to the case here is the doctor's testimony that Y.A-Y. refused to eat or drink for four-
or five-day periods and that, as a result, he lost ten pounds. Id. at *3. The doctor testified that a
continued refusal to eat or drink could have resulted in further weight loss and a failure of his bodily
functions due to dehydration. Id. The court drew from the doctor's testimony that Y.A-Y. attempted
to take his own life by starving himself to death. Id. at *9. The Tyler court concluded that, even
though Y.A-Y. was unsuccessful, his refusal to eat for days at a time was likely to cause serious
harm. Id. Accordingly, the court held that such expert testimony presented evidence of an overt act
that tended to confirm the likelihood of serious harm to Y.A-Y. Id.
Â Â Â Â Â Â Â Â Â Â Â Â Here, Dr. Chadalavada testified that R.G. had been refusing some food, to which R.G.
admits. However, the doctor indicated that R.G. had been eating recently. So, the record is unclear
as to the extent to which R.G. was refusing to eat. That is, we do not know whether R.G. refused
to eat anything at all for periods of time, as did the patient in Y.A-Y., or whether he was refusing only
certain foods consistently. Further, the doctor provided no testimony of any adverse health effects
such as weight loss, weakness, dizziness, etc. that may have illustrated how R.G.'s refusal of some
food would pose a risk of serious injury to himself.


 We lack evidence, present in Y.A-Y., of the
severity of R.G.'s refusal to eat or any resultant harm. Without such, we cannot conclude that a
refusal of some amount of food is evidence of a recent overt act which would tend to confirm the
likelihood of serious harm to R.G. In theory, such refusal could be beneficial, as in the case of
reducing caloric intake or avoidance of certain categories of food. We simply cannot tell from the
State's evidence that R.G.'s alleged refusal to eat confirms the likelihood of harm to himself or a
deterioration of his ability to function.
Â Â Â Â Â Â Â Â Â Â Â Â Therefore, we conclude that the State failed to show that R.G.'s refusal of food is a recent
overt act that tends to confirm the likelihood of harm as required by Section 574.034(d)(1). 
Similarly, without evidence regarding a negative impact R.G.'s diet has on his mental, physical, or
emotional condition, we cannot conclude that such refusal constitutes evidence of conduct that
confirms R.G.'s distress and deterioration of his ability to function. To the contrary, Dr. Chadalavada
testified that R.G. was able to feed and bathe himself and perform "basic functions." 
D.Â Â Â Â Â Â Â Â Refusal of Medication
Â Â Â Â Â Â Â Â Â Â Â Â Dr. Chadalavada testified that R.G. had refused to take Risperdal. Such evidence alone is
insufficient evidence of an overt act or a continuing pattern of behavior that demonstrates the
patient's distress and the deterioration of the patient's ability to function. See J.M. v. State, 178
S.W.3d 185, 194 (Tex. App.âHouston [1st Dist.] 2005, no pet.); see also G.H. v. State, 96 S.W.3d
629, 635 (Tex. App.âHouston [1st Dist.] 2002, no pet.) (holding evidence legally insufficient to
show substantial mental or physical deterioration despite physician's opinion that patient would
continue to deteriorate if not medicated).
Â Â Â Â Â Â Â Â Â Â Â Â Even considering R.G.'s refusal of medication with the other evidence, it still does not tend
to confirm the likelihood of harm to R.G. or his distress and deterioration of his ability to function. 
R.G. provided two bases for his refusal to take Risperdal. He stated that he felt he did not need the
medication and that he knew and disliked the side effects associated with that drug. Dr. Chadalavada
explained that Risperdal initially can cause "some kind of movement disorder" and "can cause
stiffness." He also explained that the drug can cause drowsiness and tremors. So, R.G.'s decision
to not take the medication, though perhaps not a wise decision according to the doctor's testimony,
demonstrates that R.G. was able to consider his own well-being and weigh the benefits and side
effects of taking the medication. This reasoning runs contrary to the trial court's findings that R.G.'s
condition was in the process of deterioration to the point that he could no longer function
independently and that R.G. was unable to make a rational and informed decision as to whether to
submit to treatment. We point out, too, that Dr. Chadalavada provided R.G. with the option of
taking other medications to treat his condition. Allowing R.G. to express such choices is at least
some indication that the doctor had some confidence in R.G.'s decision-making skills. We also note
that, although R.G. did refuse to take the Risperdal, he expressed his willingness to consider taking
other medication. 
IV.Â Â Â Â Â Â CONCLUSION
Â Â Â Â Â Â Â Â Â Â Â Â Here, as in K.T., the doctor's testimony and both doctors' certificates present conclusions in
terms of Section 574.034. However, the facts on which the doctors have based those conclusions
do not present clear and convincing evidence to support the trial court's order. We, therefore,
conclude the trial court could not have properly made the findings required by Section 574.034 by
clear and convincing evidence because there was no evidence of a recent overt act or continuing
pattern of behavior that tends to confirm the likelihood of serious harm to R.G. or a substantial
deterioration of R.G.'s ability to function independently to provide for his basic needs. See Tex.
Health & Safety Code Ann. Â§ 574.034(a), (d)(1), (2).
Â Â Â Â Â Â Â Â Â Â Â Â Accordingly, we reverse the trial court's judgment and render judgment denying the
application for temporary mental health services. Further, since it appears that R.G. is still in the
hospital as of the date of the issuance of this opinion, we will entertain any motion to issue the
mandate early. See Tex. R. App. P. 18.1(c).
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Jack Carter
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice

Date Submitted:Â Â Â Â Â Â Â Â Â Â February 1, 2006
Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â Â February 2, 2006



n>Tex. R. App. P. 7.1(a)(2); Whitmire v. State, 943 S.W.2d 894 (Tex.
Crim. App. 1997); Rheinlander v. State,
918 S.W.2d 527, 528 (Tex. Crim. App. 1996).

   Accordingly,
we grant the motion and permanently abate this appeal.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Josh
R. Morriss, III

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Chief
Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  August
31, 2010

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  September
1, 2010

Â 

Do Not Publish

Â 











[1]Originally
appealed to the Twelfth Court of Appeals, this case was transferred to this
Court by the Texas Supreme Court pursuant to its docket equalization
efforts.Â  See Tex. GovÂt Code Ann.
Â§ 73.001 (Vernon 2005).Â