

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

Nos. 04-18-00291-CV & 04-18-00292-CV

**THE STATE OF TEXAS FOR THE BEST INTEREST AND PROTECTION OF H.V.**

From the Probate Court No. 1, Bexar County, Texas
Trial Court Nos. 2018-MH-1084 & 2018-MH-1161
Honorable Kelly Cross, Judge Presiding

Opinion by:     Rebeca C. Martinez, Justice

Sitting:         Sandee Bryan Marion, Chief Justice
                 Rebeca C. Martinez, Justice
                 Irene Rios, Justice

Delivered and Filed: November 21, 2018

AFFIRMED

H.V. appeals the trial court's orders temporarily committing him for inpatient mental health services and compelling administration of psychoactive medication. We affirm the trial court's orders.

### BACKGROUND

The State filed an application to temporarily commit H.V. for inpatient mental health treatment. The application was supported by two physicians' certifications diagnosing H.V. with mental illness, i.e., schizophrenia, and stating that H.V. was likely to cause serious harm to himself and others, and was suffering from severe mental, emotional, or physical distress, substantial mental or physical deterioration of his ability to function independently, and was not able to make a rational and informed decision whether to submit to treatment. The State also filed an application

to compel administration of psychoactive medications during H.V.'s commitment. The trial court held separate hearings on the applications at which H.V. and his treating psychiatrist testified.[1] At the conclusion of the hearings, the trial court found that H.V. was mentally ill and met the statutory criteria for involuntary temporary commitment for mental health services under section 574.034 of the Texas Health and Safety Code. The trial court signed an order committing H.V. to the Nix Behavioral Hospital for inpatient mental health services for a period not to exceed forty-five days. By separate order, the trial court authorized the administration of anti-psychotic and mood stabilizing medications to H.V. during his commitment. H.V. appeals, challenging the legal and factual sufficiency of the evidence to support both orders.[2]

## ANALYSIS

To obtain either an order for temporary commitment or an order to administer psychoactive medication, the State must prove its case by clear and convincing evidence. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 574.034(a), 574.106(a-l). We apply a heightened standard of review to sufficiency-of-the-evidence challenges in this context due to the elevated burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In assessing the legal sufficiency of the evidence in a case requiring proof by clear and convincing evidence, we determine whether the evidence is such that a factfinder could reasonably form a "firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). We review all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010). We resolve disputed fact questions in favor of the finding if a

---

[1] Associate Judge Kathy C. Elder presided over the hearings.

[2] We have jurisdiction over the appeal even though the period for which H.V. was ordered to receive services has expired. *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010).

reasonable factfinder could have done so, and we disregard all contrary evidence unless a reasonable factfinder could not have done so. *Id.*; *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

Similarly, the higher burden of proof heightens the factual sufficiency standard of review. *In re C.H.*, 89 S.W.3d at 25-26. In evaluating factual sufficiency of the evidence under the clear and convincing standard, we inquire "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d at 25. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In so doing, we must give "due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* We examine the entire record to determine whether "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction;" if it is, the evidence is factually insufficient. *Id.*

***Commitment Order***

Section 574.034(a) authorizes court-ordered temporary commitment for inpatient mental health services if the trial court finds from clear and convincing evidence that:

(1) the proposed patient is a person with mental illness; and

(2) as a result of that mental illness the proposed patient:

    (A) is likely to cause serious harm to [himself];
    (B) is likely to cause serious harm to others; or
    (C) is:

        (i) suffering severe and abnormal mental, emotional, or physical distress;

        (ii) experiencing substantial mental or physical deterioration of [his] ability
        to function independently, which is exhibited by [his] inability, except for

reasons of indigence, to provide for [his] basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(1),(2). In its commitment order, the trial court found under subsection (a)(1) that H.V. is mentally ill, and found under subsection (a)(2) that H.V. meets the criteria in (A) and (C). *Id.* §§ 574.034(a)(1), (a)(2)(A), (C). At the hearing, counsel for H.V. stipulated to the diagnosis of schizophrenia made in the two physician certificates accompanying the State's application for commitment, which were admitted as part of the record. Thus, on appeal, H.V. does not challenge the finding that he is mentally ill, but challenges the trial court's findings under subsection (a)(2)(A) and (C). We begin by examining the evidence in support of the statutory criteria set forth in (C).

To satisfy the clear and convincing burden of proof under subsection (a), "the evidence must include expert testimony and, unless waived, evidence of . . . a continuing pattern of behavior that tends to confirm . . . the proposed patient's distress and the deterioration of the proposed patient's ability to function." *Id.* § 574.034(d). Expert testimony recommending involuntary temporary commitment must be supported by a factual basis; a bald diagnosis alone is insufficient to support commitment. *In re Breeden*, 4 S.W.3d 782, 784 (Tex. App.—San Antonio 1999, no pet.). The phrase "tends to confirm" in subsection (d) has been interpreted to mean the evidence is "to some degree probative of" the requisite finding. *See K.E.W.*, 315 S.W.3d at 24.

The factual allegations underlying the State's commitment application were that H.V. was non-compliant with his medications and treatment plan on an outpatient basis; asked his mother, "[a]re you ready to die;" acted aggressively toward family by blocking the door by nailing boards across the doorframe; exhibited dangerous and aggressive behavior in front of SAPD officers; his behavior was guarded and paranoid as expressed by his withholding information, refusing to sign

documents, and refusing to answer questions "regarding firearms in his home;" and he lacked insight and was delusional, believing that his wife was missing.

At the commitment hearing, the trial court heard the testimony of Dr. Edulfo Gonzales-Sanchez, a psychiatrist with the hospital, and the testimony of H.V.

Gonzales-Sanchez testified that H.V. had been under his care for the preceding ten days and he had met with H.V. every day. Based on his personal observations of H.V. and H.V.'s history and medical records, Gonzales-Sanchez diagnosed him as suffering from paranoid schizophrenia, which he stated is an illness, disease, or condition that substantially impairs H.V.'s thoughts, perception of reality, emotional process, and judgment. In explaining the facts underlying his diagnosis, Gonzales-Sanchez testified that he personally witnessed H.V. acting "very paranoid, very uncooperative." During their meetings, H.V. repeatedly denied having any mental illness or needing to talk to the doctor, or needing to take any medications. Gonzales-Sanchez stated that H.V. "is not able to hold rational conversations at all. His conversations revolve around his paranoid ideations, that there is nothing wrong with him and that everything that they have said about him is wrong, that he never said he would hurt anybody." When asked why he was in the hospital, H.V. told Gonzales-Sanchez that, "they made a mistake when the police had came [sic] to his house after he yelled at his parents in the room and asked if they were ready to die, and he denied it." Gonzales-Sanchez also testified that H.V. was exhibiting paranoia by being "very argumentative," repeatedly turning questions around to ask "why," stating they are "not true," and asking for more explanation. Gonzales-Sanchez stated that H.V. had not exhibited aggressive behavior while on the unit, although he described an event where H.V. suddenly grabbed the pen out of the doctor's hand and refused to give it back. H.V. was "ready to fight" over the pen, and eventually broke the pen and removed the ink for the doctor's "safety" before relinquishing it.

Gonzales-Sanchez stated that, as a result of H.V.'s mental illness, he is suffering "severe and abnormal mental, emotional, or physical distress" as exhibited by his paranoia and expressions of the need to go home and look for a job and for his wife and two children, who had left him. Gonzales-Sanchez also testified that H.V. is experiencing substantial mental or physical deterioration in his ability to function independently, which is exhibited by his inability to provide for any of his basic needs such as food, clothing, health, and safety. Specifically with regard to safety, Gonzales-Sanchez stated that H.V. was unable to differentiate between a safe situation and a dangerous situation, as shown by his willingness to fight over the pen. Finally, Gonzales-Sanchez testified that, as a result of his mental illness, H.V. was not able to make a rational and informed decision about whether to submit to treatment, and was refusing treatment and medication. He stated that the Nix Behavioral Hospital was the least restrictive appropriate setting for H.V. and that the treatment plan would be administration of antipsychotic medication and mood stabilizers.

H.V. testified at the hearing that the reason he was in the hospital was because the police came and decided to handcuff him and bring him there for "observation." H.V. stated he believed his parents had called the police, as they had a few weeks before when the police conducted a "mediation" between him and his parents inside the house. When asked whether he remembered being committed last summer, H.V. replied that he did not have any records for that. H.V. stated that his wife and kids "[j]ust up and left," and he does not have a verified location where they live but he is investigating. H.V. stated he now lives by himself "basically next door" to his parents. He denied barricading himself inside the house. When asked why his parents called the police if he did not barricade himself, H.V. replied, "the word is out for observation" and stated he initially went along with it "like a welfare check." H.V. admitted asking his mother, "are you ready to die?" When asked if he could understand how a police officer might take that statement, H.V.

replied, "No," because he was not a police officer. H.V. then added, "out of context - - in their own context, as a police officer, it may sound unusual." When asked whether he broke a glass picture on the floor in front of the policemen, H.V. conceded doing so, but explained it was "part of my art," "kind of like performance art" and "kind of like welcoming them [police officers]" into the house. H.V. also admitted asking the police officers whether they had written a will. H.V. testified that he was not being aggressive toward them, but just "would like to know" "so that I can pass it along." H.V. conceded that after asking whether they had wills, he told the officers, "because I'm going to be your last statement," but explained that referred to him being "a minor."[3]

With respect to his behavior in the hospital, H.V. stated that he took the doctor's pen because he needed to write something down for him and he broke the pen accidentally. He testified that he could not see how him taking the pen would alarm anyone in the psychiatric hospital. The State's attorney asked H.V. whether he wrote something using the words "Elder," "jag" and "less than 30 days or greater than 30 days" when he was in the courtroom the other day. H.V. replied that it was a "present," a "gift." He described it as "put together as a little football that we used to have in high school" and said that "Elder" referred to the judge presiding over the hearing, "jag" was a litigation term, and the "30 days" reference was "like a signature." H.V. conceded that he was refusing to take medication because he does not need it, stating he is able to eat and sleep properly. H.V. stated that when he was released from the hospital, he would return home. H.V. had not spoken to his parents while in the hospital. When asked how he plans to avoid his parents calling authorities to take him to a mental hospital for a fourth time, H.V. stated, "[r]easonably I think I can make a call to another court . . . another Bexar County court."

---

[3] H.V. was 23 years old at the time of the commitment hearing.

On appeal, H.V. argues there is no evidence, or factually insufficient evidence, of a continuous pattern of behavior that tends to confirm that he is suffering severe distress and deterioration of his ability to function and make rational treatment decisions. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 574.034(a)(2)(C), (d). To show the absence of proof of grounds for his commitment, H.V. cites to the doctor's testimony that he was quiet and exhibited no aggressive behavior while in the hospital, and he did not require emergency medications upon admission. H.V. discounts Dr. Gonzales-Sanchez's testimony concerning the statutory criteria being met, by asserting that he failed to provide any factual basis for his conclusions. H.V. also relies on his own testimony about his plan to care for himself after his release—he would return to the home he was renting next door to his parents, continue working day-labor and look for a steady job, and look for his wife and children. He contends this evidence shows he still had the ability to function independently.

The evidence must support a firm belief or conviction that the trial court's findings of the three criteria under subsection (a)(2)(C) are true, i.e., that (i) H.V. was suffering severe mental, emotional, or physical distress, (ii) H.V. was experiencing mental or physical deterioration of his ability to function independently and provide for his basic needs, and (iii) H.V. was unable to make a rational and informed decision whether to submit to treatment. *Id.* § 574.034(a)(2)(C)(i)–(iii). There is no requirement, however, that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570. While there was testimony that H.V. had been quiet and non-aggressive during the ten days in the hospital unit, H.V. admitted to a pattern of behavior prior to his hospitalization, i.e., asking his mother if she was "ready to die," asking the police officers if they had wills because he would be "their last statement," and breaking a glass picture to "welcome" the police officers, which tends to show he was mentally and emotionally distressed and had suffered a deterioration of his ability to function independently and safely in society. When that conduct by H.V. is

considered along with his testimony showing he failed to understand how his statements and actions could be viewed as threatening by his family or the police, it supports a finding that his mental and emotional deterioration caused him to misperceive reality and impaired his judgment. *See State of Tex. for the Best Interest and Protection of S.S.*, Nos. 04-13-00192-CV & 04-13-00193-CV, 2014 WL 2002854, at *3 (Tex. App.—San Antonio May 14, 2014, no pet.) (mem. op.) (considering the risk of legal or physical harm to the proposed patient as a result of his words or actions). H.V.'s grabbing the pen from Gonzales-Sanchez, and his willingness to fight over it before he broke it and emptied out the ink, also tends to confirm that he was unable to distinguish between a safe situation and a dangerous situation. Gonzales-Sanchez testified that H.V. was suffering from paranoid ideations and was not able to hold a rational conversation. While H.V. testified he was able to provide for his basic daily needs, "eating and sleeping properly," Dr. Gonzales-Sanchez disagreed, stating that he was not able to meet his basic daily needs, especially with regard to his health and safety. Finally, H.V. denied having a mental illness and denied needing treatment or medication to manage the illness. H.V. insisted he was only there for observation, or for a "welfare check," and that there was nothing wrong with him. Gonzales-Sanchez testified that due to his mental deterioration H.V. was unable to make a rational, informed decision about whether to submit to treatment and needed antipsychotic medication and mood stabilizers to be able to function well.

Having reviewed the record as a whole, we conclude that the evidence is both legally and factually sufficient to support the trial court's findings that the criteria of section 574.034(a)(2)(C) were met.[4]

---

[4] Section 574.034(a)(2) lists the statutory grounds (A), (B), and (C) in the disjunctive; therefore, we need not address (A).

***Administration of Psychoactive Medications***

H.V. also challenges the trial court's order compelling administration of medication signed the same day as the commitment order. "The court may issue an order authorizing the administration of one or more classes of psychoactive medication to a patient who . . . is under a court order to receive inpatient mental health services . . . ." TEX. HEALTH & SAFETY CODE ANN. § 574.106(a)(1). Here, after ruling on the commitment application, the trial court heard the testimony of Dr. Gonzales-Sanchez in a separate hearing and granted the State's application for an order to administer psychoactive medications. Gonzales-Sanchez testified that due to H.V.'s "strong delusional ideation and paranoia" he lacked the capacity to make a rational and informed decision about whether to take the proposed medications which are in his best interest. *See id.* § 574.106(a–1)(1). On appeal, the only basis on which H.V. challenges the trial court's medication order is that the evidence is insufficient to support the trial court's commitment order. Because we have determined that the evidence is legally and factually sufficient to support the trial court's commitment order, the evidence is also sufficient to support the trial court's order to compel psychoactive medications. *See State ex rel. S.S.*, 2014 WL 2002854, at \*3; *see also State ex rel. D.V.*, Nos. 04-12-00511-CV & 04-12-00512-CV, 2012 WL 6618217, at \*3 (Tex. App.—San Antonio Dec. 19, 2012, no pet.) (mem. op.).

## CONCLUSION

Based on the foregoing reasons, we overrule H.V.'s issues on appeal and affirm the trial court's orders temporarily committing H.V. for inpatient mental health treatment and authorizing the administration of psychoactive medications.

Rebeca C. Martinez, Justice